HARGROVE v. GULF, C. & S. F. RY. CO. (No. 259.)

(Court of Civil Appeals of Texas. Beaumont. March 2, 1918. Rehearing Denied March 27, 1918.)

1. COMMERCE &27(8)—RAILROADS—FEDERAL EMPLOYERS' LIABILITY ACT—REPAIR—"INTERSTATE COMMERCE."

The operator of a hoist used to load rails on flat cars, after workmen had removed them from the ties and laid new rails, was engaged in repair of tracks, and, if the road operated in two states, was engaged in interstate commerce.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. COMMERCE &8(6)—FEDERAL EMPLOYERS' LIABILITY ACT—EXCLUSIVE OPERATION.

Where a servant was injured while employed in interstate commerce, the question of assumed risk must be determined by the Federal Employers' Liability Act (April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. 1916, §§ 8657–8665]), and by the common law as recognized and construed by federal courts.

3. MASTER AND SERVANT &235(8)—INJURIES —CARE BY SERVANT.

Where it was no part of a servant's duty to place standards in the sockets on flat cars on which rails were loaded, he was not required to use even ordinary care to ascertain whether the standards were in place.

4. MASTER AND SERVANT &265(15) — INJURIES TO SERVANT—CARE.

Where an employé operating a hoist for placing rails on flat cars was required in haste to mount a car, while the train was switching, and went upon a car in which no standards were put, so that rails fell about him and endangered him, the standards used being only a few inches tall, the absence of the standards was not so plainly observable that the employé must be conclusively presumed to know of their absence.

5. MASTER AND SERVANT &288(2)—ASSUMPTION OF RISK—JURY QUESTION.

Evidence held insufficient to warrant direction of verdict for master on ground that servant assumed the risk in riding on a flat car having no standards.

6. MASTER AND SERVANT &206, 226(2)—ASSUMPTION OF RISK—KNOWLEDGE OF RISK.

An employé assumes any and all risks of danger that are naturally and ordinarily incident to the employment of the master, in which he is engaged, but does not assume any risk which arises in consequence of some negligent act or omission on the part of the employer, unless the employé has knowledge thereof, or while performing the duties of his employment with ordinary care he must necessarily have acquired knowledge thereof.

Appeal from District Court, Jasper County; A. E. Davis, Judge.

Action by Gay Hargrove against the Gulf, Colorado & Santa Fé Railway Company. Judgment on directed verdict for defendant, and plaintiff appeals. Reversed and remanded.

Powell & Huffman, of Jasper, for appellant. F. J. & C. T. Duff, of Beaumont, for appellee.

HIGHTOWER, Jr., C. J. This suit was filed in the district court of Jasper county by Gay Hargrove, as plaintiff, to recover from the Gulf, Colorado & Santa Fé Railway Company, defendant, damages for personal injuries alleged to have been sustained by plaintiff, while in the employ of said railway company, on or about October 2, 1915.

The plaintiff's petition alleged, substantially, that he was employed by the defendant to operate what· is called a loader machine on one of defendant's work trains in Jasper county, Tex., near Kirbyville; that one McKee was conductor on said train, and was foreman of the crew; that on or about October 2, 1915, said work train and crew thereon were engaged in picking up steel rails from off the right of way of defendant, and loading such rails on flat cars, and that plaintiff was operating the loader, placing them on cars; that about 1:30 o'clock in the afternoon of said day this work train was standing on defendant's main line when defedant's south-bound passenger train, going in the direction of Beaumont, came in sight, and that said conductor, McKee, thereupon signaled this work train to move to a side track, in order to let such passenger train pass; that immediately upon such signal being given, plaintiff started to the caboose attached to the rear of said work train, for his safety, as was the custom of the crew thereof to do, when this work train was to be moved from one point to another; that, just after starting to the caboose, he was ordered by defendant's said conductor and foreman in charge of said work train to go back to the loader machine, and fix up the boom used in connection with loading rails on said work train, which order plaintiff obeyed, and that after fixing the boom the work train was moving at too great rate of speed for him to get off of the same and catch the caboose, and that he sat down on the edge of an empty flat car, which was between the car the loader machine was on and the car loaded with steel rails, and on the end of said empty car next to such loader machine; that there were no standards placed in the side of the loaded car in front of the car upon which plaintiff sat down, which fact was unknown to plaintiff, and that the work train was running at such rate of speed, on its way to the side track, that the steel rails fell off of said loaded car, and were thrown, pitched, and propelled by said moving train to and near the place where plaintiff was sitting on said flat car, and in such manner as to render his life in great danger; that, in order to protect himself from such danger, plaintiff was compelled to jump from said moving train, and while

---

thus trying to escape from such danger plaintiff received the injuries complained of. The specific acts of negligence charged against defendant were: (1) That the car upon which the steel rails fell was negligently and carelessly loaded by the defendant, in that there were no standards placed in the pockets on the side of said car to hold the rails thereon and to prevent them from falling therefrom; (2) that defendant was negligent in causing plaintiff to remain on said flat car while said train was being moved, instead of permitting him to go to the caboose, where he attempted to go; (3) in running, and permitting to be run, the work train in such way and manner and at such rate of speed as to throw the steel rails therefrom, which the defendant then and there knew had no standards or guards upon it to prevent said rails from falling therefrom.

Defendant answered by general demurrer, several special exceptions, and general denial, and further specially answered substantially as follows: (1) That defendant was an interstate carrier, operating a line of railway from points in Oklahoma to Galveston, Tex., for the transportation of freight and passengers in interstate commerce, and that the part of the line on which plaintiff was injured was used by it in the carrying on of its interstate commerce; that plaintiff, at the time of his injury, was engaged in repairing said track, in order that such interstate commerce might be successfully carried on, and that, therefore, its liability to plaintiff for the injuries, if any, which he sustained, existed under and by virtue of the Federal Employers' Liability Act. (2) That defendant was not negligent in failing to place standards on the car that was being loaded with rails, as said car had not been completely loaded, and that the plaintiff knew that it was not customary to place standards on said car until the loading had been completed. (3) That plaintiff knew that there were no standards on said loaded car, or by the use of reasonable diligence could have known it, and that in going upon said car, instead of remaining on the car upon which the loader was situated, plaintiff was guilty of contributory negligence. (4) That at the time plaintiff went upon said empty car and sat down he knew, or by the use of reasonable diligence could have known, that the car loaded with steel rails had no standards on it, and that the danger of said rails falling from said car was as open and apparent to the plaintiff as to the defendant, and that plaintiff assumed all risk of danger of injury to him by reason of his being on said car. (5) That plaintiff was not in any danger of being injured by the rails falling off said flat car while on such empty car, and would not have been injured had he remained on said car, but that the injury to plaintiff was caused by reason of his jumping off of said car while the train was in motion, thereby contributing to his injury,

and was therefore guilty of contributory negligence. (6) That there had been provided for plaintiff a safe place to work, to wit, a car on which the loader machine was placed, and that plaintiff should have remained in his position where the loader machine was placed, both while discharging the duties of his employment, and while the train was being moved from one place to another, and that if plaintiff had remained in his place where said loader machine was he would not have been injured, and that plaintiff, in leaving such position and going to the empty flat car while the train was moving, assumed all risk of injury which might occur to him by reason of his being on said flat car.

To this answer plaintiff filed a supplemental petition, and among other things denied, in substance, that defendant, on the occasion in question, was an interstate carrier, and also denied that plaintiff was engaged in interstate commerce or in aid thereof, and denied that the liability of defendant for the injuries complained of was covered by the Federal Employers' Liability Act.

Upon trial of the case below, the court, after the evidence was concluded, at the request of defendant peremptorily instructed the jury to return a verdict in its favor, which request was granted, and the jury, in obedience thereto, returned a verdict in favor of the defendant, upon which verdict judgment was entered accordingly. Plaintiff filed a motion for new trial, which was overruled, and the case is properly before this court on appeal.

Appellant's first assignment of error complains of the action of the court in peremptorily instructing a verdict in favor of appellee, and in that connection contends that the evidence adduced was sufficient to raise an issue for the consideration of the jury relative to the allegation in his petition that appellee was guilty of negligence in failing to have standards in the pockets on the side of the car on which the steel rails were loaded, and that such issue should not have been taken from the jury; and by his second assignment of error appellant complains that, even if the evidence was sufficient to show that appellee was engaged in interstate commerce, and that appellant was employed and engaged in futherance thereof, and that, therefore, appellee's liability should be governed by the Federal Employers' Liability Act, nevertheless the defense of assumed risk interposed by appellee in that connection was by the evidence adduced made one of fact for the consideration of the jury, and that the court erred in assuming that appellant assumed the risk which resulted in his injuries as a matter of law.

The contention of appellee is that the evidence showed conclusively that appellee, on the occasion in question, was an interstate carrier of passengers and freight, and was engaged in interstate commerce, and that ap-

pellant was engaged in the aid and furtherance thereof; and, further, that the evidence shows conclusively that the injuries which were sustained by appellant were caused on account of the absence of standards on said car on which said steel rails were loaded, and that the absence of such standards was known to appellant, or by the use of proper care on his part, while in the discharge of his duties, could have been known to him, and that he fully appreciated the danger arising by reason of the want of standards on said car, and that, therefore, appellant was not entitled to recover for any injuries so sustained, and that the trial court correctly instructed a verdict for appellee.

As we view the record in this case, there are really only two questions for the consideration of this court: First, was the liability of appellee for the injuries complained of by appellant dependent upon the act of Congress passed in 1908 relative to the liability of railway companies engaged in interstate commerce for injuries sustained by their employés; and, if so, then, second, whether the evidence introduced on the trial below was such as to compel the conclusion, as a matter of law; that appellant assumed the risk of danger which resulted in his injuries.

It was shown conclusively, we think, that appellant's line on which the injury occurred was regularly used for the purpose of transporting both interstate freight and interstate passengers, and that its main line of road extended from the city of Galveston, in the state of Texas, into the state of Oklahoma, and that its line on which the injury to plaintiff occurred connected with several other lines of railroad regularly engaged in carrying interstate passengers and interstate freight handled by appellee over said line.

At the time of appellant's injury he was in the employ of appellee, and his duties were to operate what is called a loader machine, which machine was placed and fastened upon a flat car in a work train used by appellee for picking up steel rails from its track and carrying them to side tracks or spurs and there unloading such rails. There were some five or six persons engaged in this work train on which appellant was injured, and the entire crew, according to the record, was under the control and supervision of one McKee, who was conductor of said work train, and foreman of the crew. Just ahead of this work train was another crew working for appellee, and which was engaged in taking up these steel rails and putting down other rails in their stead, all of which was deemed necessary for the proper repair and upkeep of appellee's railroad, in carrying and transporting interstate passengers and freight.

It is contended by appellant that he cannot be said to have been engaged in interstate commerce carried on by appellee, or in furtherance or aid thereof, for the reason that what he was doing, namely, assisting in picking up rails that had been taken up from appellee's track and removing them to side tracks, cannot be held to have been "repairing of said track," but that such repairing was complete, and pertained only to what was done by the crew which was engaged in tearing up said track and in putting down the new rails.

[1] As sustaining its contention that appellant was engaged in interstate commerce or in aid or furtherance thereof, as carried on by appellee, appellee cites the following authorities: Pedersen v. Ry. Co., 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914C, 153; Lombardo v. Ry. Co. (D. C.) 223 Fed. 427; Ry. Co. v. Thompson, 232 Fed. 353, 146 C. C. A. 401; Ry. Co. v. McConnell, 228 Fed. 263, 142 C. C. A. 555; Ry. Co. v. White, 177 S. W. 1185; Truesdell v. Ry. Co., 159 Ky. 718, 169 S. W. 471; Ry. Co. v. Crockett, 234 U. S. 727, 34 Sup. Ct. 897, 58 L. Ed. 1564; Ry. Co. v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; Freeman v. Powell, 144 S. W. 1033; Ry. Co. v. Netherton, 175 Ky. 159, 193 S. W. 1035.

Pedersen v. Railway Company, supra, seems to be the leading case on the point here involved, and, if the conclusion reached by the Supreme Court of the United States in that case and subsequent cases following it be correct, then we think that it must be held by this court that appellee was an interstate carrier of freight and passengers at the time of appellant's injury, and therefore engaged in interstate commerce; and, further, that the appellant at the time of his injury was employed and engaged in furtherance and in aid of such interstate commerce. It stands to reason that appellee's railroad could not long be safely and properly operated if the steel rails which had been removed from the track when others were being put down had been permitted to remain on and about appellant's track, and interfere, which they naturally would, with the proper upkeep and repair of such track, and perhaps would render it unsafe, not only for the proper operation of appellee's trains thereover, but also might endanger employés engaged in the necessary and proper upkeep and repair of such track. We believe that what appellant was doing on the occasion in question must be held to be in the nature of repairs to appellee's track. It may be that the Supreme Court of the United States went the extreme limit on this question in the Pedersen Case, supra, and other cases following that; and while it is true that three of the Justices of that court dissented in the Pedersen Case, nevertheless the decision is one by that court, and, the subject-matter being one concerning which the decisions of that court are final and must control, this court has no alternative but to follow such decisions. We therefore hold, upon the authority of the cases above cited, that the liability of appel-

lee in this case is dependent upon, and must be determined by, the act of Congress above mentioned, and by the decisions of the Supreme Court of the United States construing that act; and, applying the provisions of said act of Congress and decisions of the Supreme Court of the United States construing the same, we must hold that appellant was engaged in interstate commerce, or in aid and furtherance thereof, at the time of his alleged injury.

[2] Having reached this conclusion, we must further hold that the question of assumed risk involved in this case is to be determined by the provisions of said act of Congress, and by the common law, as recognized and construed by the federal courts. Seaboard Air Line Ry. Co. v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1068, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475.

That part of the act of Congress mentioned applicable here is as follows:

"In any action brought against any common carrier under or by virtue of any of the provisions of this act, to recover damages for injuries to, or the death of, any of its employés, such employé shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employés contributed to the injury or death of such employé."

It has been repeatedly held by the federal courts, and by the appellate courts of this state following those decisions, that this provision of said act of Congress leaves unimpaired the common-law defense of assumed risk, except in cases where the injury complained of was caused by a violation of some of the provisions in said act, which were made for the benefit of such employés; and since the question here to be determined does not involve the violation of any federal enactment for the safety of employés, the doctrine of assumed risk, as it was known to the common law, and as the same has been construed by the federal courts, must govern. What seems to us to be a very clear enunciation of the doctrine of assumed risk, as recognized by the Supreme Court of the United States, may be found in the case of Gila Valley G. H. & N. Ry. Co. v. Hall, 232 U. S. 101, 34 Sup. Ct. 229, 58 L. Ed, 524, and also Seaboard Air Line Ry. Co. v. Horton, supra, and also C. O. & G. Ry. Co. v. McDade, 191 U. S. 68, 24 Sup. Ct. 24, 48 L. Ed. 100.

In the Ry. Co. v. Hall Case, supra, the Supreme Court of the United States had occasion to make an accurate application of the doctrine of assumed risk, as the same existed at common law, arising out of the failure of the trial court to give certain requested charges for the railway company, and in the giving of a charge by the court, over the objection of the railway company. The court used this language:

"There was a request for instructions to the effect that the plaintiff assumed the risk of injury from defects which he knew, or by the exercise of ordinary care in the discharge of his duties might have known, or which he had the opportunity to know. These instructions the court refused to give, but charged the jury upon this question: 'The true test is not in the exercise of ordinary care to discover dangers by the employé, but whether the defect is known or plainly observable by him. An employé is not charged by law with the assumption of a risk arising out of defective appliances provided by his employer, unless his employment was of such a nature as to bring to his attention and cause him to realize and comprehend the dangers incident to the use of such appliances.'

"This, we think, was a correct instruction under the circumstances of the case. An employé assumes the risk of dangers normally incident to the occupation in which he voluntarily engages, so far as these are not attributable to the employer's negligence; but the employé has a right to assume that his employer has exercised proper care with respect to providing a safe place of work, * * * and is not to be treated as assuming the risk arising from a defect that is attributable to the employer's negligence, until the employé becomes aware of such defect, or unless it is so plainly observable that he may be presumed to have known of it. Moreover, in order to charge an employé with the assumption of a risk attributable to a defect due to the employer's negligence, it must appear, not only that he knew (or is presumed to have known) of the defect, but that he knew it endangered his safety; or else such danger must have been so observable that an ordinarily prudent person, under the circumstances, would have appreciated it."

Now, bearing in mind the doctrine of assumed risk, as recognized and applied in the above cases, we shall proceed to state briefly the facts disclosed by the record in this case, and, applying such doctrine to the facts, determine whether the trial court was correct in assuming, as a matter of law, that appellant's injuries, if any, resulted from a risk of danger assumed by him.

The testimony of appellant himself was, among other things, substantially as follows: That, under his contract of employment with appellee, his duties consisted only in the operation of the loader machine hereinbefore mentioned; that this machine was operated by means of a lever, and attached thereto was what is called a boom, which was a long piece of timber about 20 feet in length, 12 inches wide, and 6 inches thick, to which boom there were fastened chains and tongs, and this boom, by means of the operation of the loader machine, would be extended out over the steel rails that were to be loaded on the empty flat cars, and the tongs attached to same would be fastened around the steel rails, and then, by operation of the lever of the loader machine in the hands of appellant, these steel rails would be raised in position and laid on an empty flat car, and this would be kept up until the flat car was fully loaded; that the rails thus being loaded on the flat car were about 28 feet in length, and the car itself was about 36 or 40 feet in length; that a car was considered loaded when two layers of rails had been placed upon it; that appellant had nothing to do with adjusting the rails in proper place on the car, but that this was done by other members of the crew, of which he was one; that when the loading of a car had been completed the loader machine

would be moved onto another flat car and fastened, and then by the same process another empty flat car would be loaded with these steel rails; that while such loading would be going on there. was always an empty flat car between the car on which the loader machine was fastened and the car on which rails were being loaded; that about 1:30 o'clock p. m. on the day in question this crew had just completed loading one of these flat cars with rails, and were just about to commence the loading of another, and the loader machine had been replaced for that purpose, and that about that time one of appellee's passenger trains going south came in sight, and its further passage being obstructed by this work train, appellee's conductor and foreman on the work train gave signals for the work train to move at once to a side track, in order that the passenger train might pass; that when such signal was given by appellee's conductor appellant immediately started to the caboose attached to this work train, because he considered that the safest place to be while the work train was being moved, and that it was the custom of himself, and perhaps other members of the crew engaged in the loading of rails, to go to the caboose whenever the work train was to be moved to a siding; that when appellant was about 25 or 30 feet distant from the loading machine, on his way to the caboose, appellee's conductor stopped him, and told him to go back and fasten the boom, and that thereupon, and in obedience to such command of the conductor, appellant returned to the boom, and proceeded to fasten the same in its proper place, so that it might not swing to and fro while the train was in motion; that it was part of his duty to see that the boom was properly secured before the train would be moved, but that he did not fasten the boom on that occasion before the train was moved, for the reason that he did not have time after the signal by the conductor was given and before the train started; that by the time appellant had succeeded in securely fastening the boom, as ordered by the conductor, the train was moving at a speed of approximately 15 miles an hour, and that for such reason he did not again attempt to go to the caboose, and also because in order to have gotten to the caboose he would have had to climb over or go around the engine itself, which was between him and the caboose; that finding himself in these circumstances, he sat down on the edge of an empty flat car, which was between the loader machine and the car loaded with rails, and thought that the place where he sat down was just as safe as any other place on the train except the caboose; that after the train had been moved some 500 or 600 yards in the direction of the side track the steel rails that had just been loaded on the flat car next to him commenced to fall off, and to fall in his direction, several at a time, and that he immediately discovered that he was in danger of being killed or seriously injured if he remained on the car on which he was sitting, and that he thought that it was necessary for him to jump from said flat car in order to protect his life, and that he did jump therefrom, and was injured by being struck on the head by something, though he knew not what, either about the time he jumped, or while in the act of jumping, or after reaching the ground; he could not say definitely just where he was at the time he was struck.

Appellant further testified that it was always customary since he had been working with this crew, which was about two weeks, to put standards in the pockets of these flat cars, after being loaded with rails, before the train would be moved, and that it was necessary to do so to prevent the rails from falling off of the car while the train was in motion; that on the occasion in question standards had not been put in the pockets of the car on which these steel rails were loaded before said train was ordered to move, and that on account of the absence of standards in said car these rails were caused and permitted to fall off, as they did, and to endanger appellant, as above stated; that these standards consisted of small pieces of timber, or sometimes what is called iron fish plates, and that these would be placed in these pockets, one at each end of the car so loaded, and one in the middle, on each side of the car, making six standards to the car; that when a car was fully loaded the height of the rails on it was about six inches, and these standards were supposed to be of sufficient height to prevent the rails from falling off the car. In this connection we might say that the record does not disclose the exact height of these standards, whatever the material used, but we think that it is a reasonable inference, from the testimony, that these standards, when used, did not extend more than a few inches, if at all, above the height of the rails on the car.

Appellant further testified, positively, that at the time this work train was caused to be moved to the side track, as above stated, he never knew that standards had not been placed on this car loaded with rails; that he had not observed their absence, and really never thought about the matter, and had not discovered the absence of these standards at the time the conductor ordered him back to fasten the boom, and, in fact, never discovered the absence of these standards at all until after he was injured. He further testified that it was no part of his duties to see that standards were put in a car after being loaded, before the train was moved, and that he had never been asked by appellee's conductor and foreman to do so, and that he had nothing whatever to do with a car of rails after the car was completely loaded, and in fact had nothing to do with any part of the train other than to operate the loader machine.

It was further proved in this connection, by appellant's witness McNeely, that it was

always customary to put standards on a car of rails after loading thereof was complete and that it was necessary to do so to keep the rails from falling off while the train was being moved from place to place, and, further, that no standards were on the east side of this car of rails at the time appellant claims to have been injured; that there were standards on the west side of this car at the time; and, further, that if standards had been in the pockets on the east side of the car the rails would not have fallen off as they did on the occasion in question; and we might state further, in this connection, that the rails fell off of the east side of the car in question.

It was clearly shown, by the cross-examination of appellant, that he knew these rails would probably fall from a car unless they were protected by standards placed in the car, and that he knew that it would be dangerous to be anywhere in close proximity to one of the cars loaded with rails while the train was being moved, in the absence of such standards, and the evidence warrants the conclusion that appellant knew that he might be injured where he was sitting on the empty flat car, in the event the rails on the loaded car in question might fall therefrom, on account of the lack of standards in said car; but there is no contention on the part of appellee, as we understand it, that appellant actually knew that standards had not been placed in the car on the occasion in question before he was injured, and, since, as above shown, appellant positively testified that he did not know of the absence of standards on this car, and since it is conceded in appellant's brief that the lack or absence of these standards was the proximate cause of whatever injury appellant sustained, and since appellee's failure to have standards on this car, which is the real claim of negligence here, was a question of fact for the jury, it follows necessarily that the trial court was in error in peremptorily instructing a verdict in favor of appellee, unless upon the facts stated appellant should be conclusively presumed to have known of the absence of such standards.

[3] Now, recurring again to the rule as announced by the Supreme Court of the United States in Gila Valley Ry. Co. v. Hall, supra, "that the employé has a right to assume that his employer has exercised proper care with respect to providing a safe place of work, and suitable and safe appliances for the work, and is not to be treated as assuming the risk arising from a defect that is attributable to the employer's negligence, until the employé becomes aware of such defect, or unless it is so plainly observable that he must be presumed to have known of it," the question is, Do these facts compel the conclusion that the absence of standards in this car was so plainly observable by appellant that he must be held to have known of their absence? We think that upon the facts of this case such presumption should not be indulged as a matter of law. As shown above, it was no part

of appellant's duty to place standards in these cars when loaded, or to see that such was done by any one else, and, under the rule as announced by the Supreme Court in the above-cited cases on this question, appellant was not required to use even ordinary care to ascertain whether this was done. That court has said:

"The true test is not in the exercise of ordinary care to discover dangers, by the employé, but whether the defect is known or was so plainly observable by him as to compel the conclusion that he must have known thereof."

[4] It should also be remembered that these standards, the absence of which was complained of, were not of such character as are usually observed on trains loaded with lumber, etc., piled to a considerable height on a car, and which, in cases of that kind, must be at least several feet in length, and which usually extend higher than a man's head above the edge of the car on which such material is loaded; but the standards usually used, according to the testimony in this record, for the purposes in question, were very insignificant, and were of no certain kind of material, and in fact, as stated above, the reasonable inference is that these standards did not extend in height exceeding perhaps six or seven inches, and, at the most, not more than twelve inches, and therefore they could not have constituted a very conspicuous object when placed in the pockets of the car loaded with these steel rails, the height of which, we judge from this record to be about equal to that of the rails themselves, and we therefore feel that this court would not be justified in holding that the absence of these standards was so plainly observable by appellant that he must be conclusively presumed to have known of their absence.

[5] It should also be remembered, as the testimony in the record before us discloses, that this work train was caused to be started very suddenly by appellee's conductor and foreman, upon the approach of the passenger train on the main line, and in fact so suddenly, as appears from this record, that appellant did not have time to securely fasten the boom on his loader machine, as was his custom and duty to do. Taking all these facts into consideration, we feel constrained to hold that the trial court was not authorized to peremptorily instruct a verdict for appellee upon the theory that the injury, if any, received by appellant, was the result of a risk assumed by him. We therefore sustain all assignments of error found in appellant's brief, without discussing them more in detail, since they all relate, in effect, to the action of the court in taking this case away from the jury upon the theory that appellant should be denied a recovery under the doctrine of assumed risk.

We note in appellee's brief this counter-proposition of law:

"Where the master and servant are possessed of equal knowledge of defects and dangers, or

where they are equally ignorant thereof, the servant will be held to have assumed the risk."

We do not question the fact that some of the authorities cited by appellee in support of this proposition sustain the same, but as hereinbefore stated, the doctrine of assumed risk, as recognized and applied by the federal courts, and especially the Supreme Court of the United States itself, must control in the disposition of this case, and, as shown by the authorities emanating from the federal courts, this proposition of law contended for by appellee is not sound, or at least it is too broad, and cannot be adopted as applicable to the decision of this case.

[6] If we understand correctly the rule of assumed risk, as the same has been construed and applied by our own appellate courts, it is that an employé assumes any and all risks of danger that are naturally and ordinarily incident to the employment of the master in which he is engaged, but that the employé does not assume any risk which arises in consequence of some negligent act or omission on the part of the employer, unless the employé have knowledge thereof, or that while performing the duties of his employment with ordinary care he must necessarily have acquired knowledge thereof. But whether this be the rule in our own state courts or not, the enunciation of the rule of assumed risk by the federal courts must govern in this case, and, under the rule as applied by those courts, the fact that the absence of standards in the car in question was as obvious and apparent to appellant as it was to appellee or its conductor in charge of said train at said time, or that their means of knowledge of the absence of such standards were equal, cannot control the disposition of this case.

The judgment of the trial court is therefore reversed, and this cause is remanded for a new trial consistent with the views which we have expressed.