TEXAS & N. O. R. CO. v. GERICKE.
(No. 472.)

(Court of Civil Appeals of Texas. Beaumont. June 26, 1919. Rehearing Denied July 2, 1919.)

1. MASTER AND SERVANT ☞103(1)—INJURY TO SERVANT—SAFE PLACE TO WORK—DUTY NONDELEGABLE.

It is the duty of an employer, to take necessary reasonable precautions to make the servant's place of work reasonably safe and such duty is nondelegable.

2. MASTER AND SERVANT ☞279(5)—INJURY TO SERVANT—SUFFICIENCY OF EVIDENCE—NEGLIGENCE OF FOREMAN IN ABSENTING HIMSELF WITHOUT NOTICE.

In a railroad employé's action for injuries by being knocked from a scaffold by a passing wagon, while painting a bridge over a street, evidence *held* to authorize a finding that the foreman, keeping lookout for vehicles, was negligent in leaving the bridge without notifying plaintiff or his fellow workmen of his departure.

3. MASTER AND SERVANT ☞276(3), 278(9)—INJURY TO SERVANT—SAFE PLACE TO WORK—SCAFFOLDING OVER STREETS—FAILURE TO KEEP LOOKOUT FOR VEHICLES—PROXIMATE CAUSE—EVIDENCE.

In an action for injuries to a railroad bridge painter knocked from the scaffold by a vehicle passing on the street below, evidence *held* to warrant a finding that defendant was negligent in failing to furnish a reasonably safe place for work by failure to keep a lookout for vehicles, and that such negligence was the proximate cause of plaintiff's injuries.

4. MASTER AND SERVANT ☞203(1)—INJURY TO SERVANT—ASSUMED RISK.

The rule of assumed risk in Texas is the same as it was known to the common law, except where abrogated or modified by statute.

5. MASTER AND SERVANT ☞204(1)—INJURY TO SERVANT—RAILROADS—FEDERAL EMPLOYERS' LIABILITY ACT—ASSUMED RISK.

The defense of assumed risk is left available to railroad company by the Federal Employers' Liability Act and amendments (U. S. Comp. St. §§ 8657–8665), where a workman is injured by being knocked from a scaffold by a passing vehicle while painting a railroad bridge used by interstate trains.

6. MASTER AND SERVANT ☞288(16½)—INJURY TO SERVANT—SCAFFOLD UPON BRIDGE OVER STREET—RELIANCE ON MASTER'S FOREMAN KEEPING LOOKOUT FOR VEHICLES—QUESTIONS FOR JURY.

In an action for injuries to a railroad bridge painter knocked from a scaffold by a

vehicle passing on the street below, *held*, under the evidence, that it could not be said, as a matter of law, that he assumed the risk of injury from foreman's failure to keep a lookout.

7. MASTER AND SERVANT ☞203(1)—INJURY TO SERVANT—ASSUMPTION OF RISK—GROUND OF NEGLIGENCE—INDEPENDENT GROUNDS.

Assumed risk must be confined to the ground of negligence found warranting recovery, and it is immaterial to what extent the risks of independent grounds of negligence may have been assumed.

8. MASTER AND SERVANT ☞280—INJURY TO SERVANT—EVIDENCE—ASSUMPTION OF RISK.

In an action for injuries to a railroad bridge painter knocked from a scaffold by a vehicle passing on the street below, evidence *held* sufficient to authorize a finding that his injuries were not the result of a risk that he had assumed.

Appeal from District Court, Harris County; J. D. Harvey, Judge.

Suit by Louis Gericke against the Texas & New Orleans Railroad Company, W. J. Lemp Brewing Company, and the Falstaff Manufacturing Company. Plaintiff dismissed suit as to the Brewing Company. Verdict in favor of the defendant Falstaff Company and in favor of the plaintiff as against the defendant Railroad Company, and the latter appeals. Judgment affirmed.

Baker, Botts, Parker & Garwood and McMeans, Garrison & Pollard, all of Houston, for appellant.

Presley K. Ewing, of Houston, for appellee.

HIGHTOWER, C. J. We take from appellant's brief the following statement showing the nature and result of this suit, which, as far as it goes, is conceded by appellee to be correct:

Appellee, Louis Gericke, plaintiff below, brought this suit against the appellant, Texas & New Orleans Railroad Company, and William J. Lemp Brewing Company, and the Falstaff Manufacturing & Mercantile Company, to recover damages for personal injuries sustained by him while in the service of the appellant railroad company, and engaged in painting a bridge of said company which extended over and against Third street, in the city of Houston, at a distance of 15 or 20 feet in height from said street.

In his petition plaintiff alleged, in substance, that in doing said work he was required to stand upon a hanging scaffold, which was attached to the top portion of the bridge, the said scaffold being composed of attachments from the top of the bridge to which were hung certain crosspieces, upon the latter of which planks were laid; that while he was so engaged in said work a

wagon belonging to the William J. Lemp Brewing Company and the Falstaff Manufacturing & Mercantile Company, driven by their agent, was driven along Third street, under said bridge; that at or near the front of said wagon, where the driver sat or was accustomed to sit, there was a high top or covering, and that while the wagon was passing under the bridge said top or covering came in contact with a portion of the scaffolding upon which plaintiff was standing in doing his work, and thereby knocked said plank out from under him, or otherwise hit the same, with the direct result that he was knocked off or caused to fall off of the scaffold and upon the brick pavement below, and upon a portion of the wagon as it passed, whereby he sustained the injuries for which he sued.

Plaintiff alleged that his fall and consequent injuries were proximately caused by the following acts of negligence upon the part of appellant railroad company, its agents and servants, viz.:

(1) In the negligence of the defendant railroad company, acting through its vice principal in charge, in the line of his duties, of the plaintiff and his co-workmen, in having the said scaffold built or suspended too close to the street, whereby it was liable to come in contact with passing vehicles upon the street, which fact should have been known to said vice principal in the exercise of ordinary care, thereby imposing upon him the duty to keep a lookout for the protection of the men, including plaintiff, upon the scaffold, who were unable in the discharge of their duties to keep a lookout for passing vehicles, but which danger was not known to plaintiff at and before he received said injuries; that it was no part of plaintiff's duties to designate the height of the scaffold, nor did he have or exercise any control or supervision over the erection thereof, or the manner of its erection, or the means and methods by which the said work in hand should be performed, but he assumed, as he had the right to do, that the means, manner, and method of doing the said work were safe, and that the scaffold was erected in a proper manner with regard to the passage of vehicles upon the street, or at least that proper precaution would be taken by the said vice principal in keeping or having kept a proper and sufficient lookout for passing vehicles to warn their drivers or the workmen upon the scaffold, including plaintiff, of impending dangers from passing vehicles, so that he would not be exposed, as he was, to the unusual and extraordinary danger, while engaged in his work of painting, and his duties attendant thereto, of being knocked or caused to fall off of the scaffold by the passing of high vehicles on the public street, the facts being' that plaintiff was not acquainted with the neighborhood in which he was doing his work, and was ignorant of the character of street and ignorant of the extent and character of traffic thereon, nor was he warned thereof in any manner, although the said vice principal knew thereof, and knew, or in the exercise of ordinary care should have known, that plaintiff did not.

(2) In the negligence of the defendant railroad company, acting by and through its said vice principal, in failing to have and maintain a watchman at or about the street to warn and notify passing vehicles with tops upon them not to drive under the said bridge, or, in default of doing so (which was not done), in his negligently failing to keep and maintain, or to see that there was kept and maintained, a reasonable and sufficient lookout by himself or by other method for passing vehicles calculated, as was this one, to be dangerous to the men, including plaintiff, working upon said scaffold, as the plaintiff did in fact expect to be done, and thought was done, and in his negligence to take, or to see taken, any other means or precaution to prevent passing vehicles from passing under the bridge in such manner or under such circumstances as to strike said scaffold.

(3) In the negligence of the said vice principal, in the line of his employment for the defendant, in failing to warn, as he did fail to do, the plaintiff of the dangers of his employment, particularly that he was taking no means to safeguard the plaintiff from the dangers aforesaid, as the plaintiff alleges was the case at and before the time of his injury.

The railroad company, the only appellant here, answered by general denial and plea of the negligence and contributory negligence of the plaintiff causing his injuries, and also by plea of assumed risk; and, in connection with the latter plea, appellant alleged that it was a common carrier, engaged in interstate commerce, and that the bridge in question was a part of its railroad used for interstate commerce, and that the painting of said bridge was for its preservation as an instrument of interstate commerce, and that the plaintiff in painting said bridge was engaged in work in furtherance of interstate commerce, and that his right of action for injuries sustained by him, and the liability of appellant therefor, were determinable under the rules laid down by the act of Congress known as the Federal Employers' Liability Act, and the several amendments thereto (U. S. Comp. St. §§ 8657–8665).

Appellant further alleged that the act of the driver of the wagon in running against the scaffold was the sole proximate cause of plaintiff's injuries.

By supplemental petition plaintiff alleged that on the occasion in question he did not know, and would not necessarily have known, in the ordinary discharge of his own duties, of the danger to which he was exposed, nor was such danger obvious to him for that he

had the right to rely on the assumption, and he did rely on the assumption, that the defendant railroad company would exercise all ordinary care to maintain for him a reasonably safe working place, and to that end it would give the ordinary and usual signal and warning in such case, and such as a person of ordinary prudence under like circumstances would have done, in which event the danger to which he was exposed would not have existed; but, on the contrary, the defendant railroad company then and there negligently failed to exercise ordinary care to maintain for him a reasonably safe working place, or to adopt any means or take any precautions to that end, of which he was ignorant, whereby and as a proximate result thereof he was exposed to extraordinary danger, and injured, as aforesaid.

The case was submitted to a jury upon special issues, in answer to which the jury, by its verdict, found (1) that a person of ordinary prudence, on the occasion in question, in the relation the defendant railroad company then occupied to the plaintiff, as a means of maintaining the working place reasonably safe, would have taken, or seen to the taking, under all the attendant circumstances, of some reasonable precaution by lookout for vehicles, or by warning to plaintiff, to prevent a passing wagon from striking the scaffold in a manner to endanger plaintiff's safety; (2) that the defendant railroad company, on the occasion in question, failed to take, or see to the taking of, any such precaution; (3) that such failure on its part was negligence towards plaintiff—that is, a failure to exercise such care towards him as an ordinarily prudent person would have exercised under the same or similar circumstances; (4) that such negligence was a proximate cause of alleged injury to plaintiff; (5) that the driver of the wagon in question did not actually discover that plaintiff, or some person, was on the scaffold where plaintiff was, and that if he, the said driver, continued in his course, as he was doing, the top of the vehicle he was driving would probably or likely come into collision with said scaffold and cause the injury to plaintiff; (6) that such driver, after making such discovery, did not continue in the course as he was doing and fail to use all reasonable means at hand to avoid collision of the wagon with the scaffold and injury to the plaintiff; (7) that such failure on his part was not a proximate cause, as defined by the court, of alleged injury to plaintiff; (8) that the plaintiff, on the occasion in question, was not guilty of negligence as defined by the court, in not raising the scaffold high enough to clear vehicles, such as the alleged wagon, or in lowering the scaffold enough to come in contact with such vehicles; (9) that the plaintiff did not know, nor was it obvious, nor must it necessarily have been known to him, in the ordinary discharge of his own duties, that the defendant railroad company was taking, or would take, no precautions for his safety by lookout for vehicles, such as the wagon in question, or by warning the plaintiff, as submitted to the jury in special issues 1 and 2; (10) that $10,000 was fair and adequate compensation for the alleged injuries sustained by plaintiff on the occasion in question.

The grounds of negligence alleged by plaintiff, to wit, of the negligence of appellant's vice principal in having the scaffold too low to the street, and the negligence on the part of appellant in not having an independent watchman, were not submitted for the jury's consideration, and the judgment in this case is in no manner based or dependent upon either of those grounds, but rests alone upon the third ground of alleged negligence above mentioned.

Previous to the submission of the case to the jury, plaintiff dismissed his suit against the William J. Lemp Brewing Company, and it had judgment for its costs, etc.; and the jury having found that the Falstaff Manufacturing & Mercantile Company was guilty of no negligence, as alleged by plaintiff, judgment was rendered in its favor as against the plaintiff; but on the verdict of the jury judgment was rendered in favor of the plaintiff as against defendant Texas & New Orleans Railroad Company for the sum of $10,000, with legal interest thereon, and from this judgment the railroad company has brought the case here by appeal.

By the first assignment of error it is complained that the trial court erroneously refused to peremptorily instruct the jury to bring in a verdict in appellant's favor.

By the first proposition under this assignment it is contended that the undisputed evidence showed, to such a degree as to render any other conclusion wrong, that the injury sustained by the appellee did not result from any actionable negligence on the part of appellant.

Before mentioning the evidence in detail, we make this further statement, which we take from appellant's brief, as we find the same to be substantially correct:

Appellee was a painter, in the employment of the defendant, and was working under appellant's foreman, S. J. Stoner, and Stoner, as shown by this record, was appellant's vice principal. There were ten men in the crew working on this bridge.

On the occasion of plaintiff's injury, six of the crew, under the immediate direction of Stoner, began preparations for painting the bridge, which extended above Third street, in the city of Houston. This bridge is between 15 and 20 feet above the street. The street under the bridge is spoken of as a "tunnel." The sides of the walls of the tunnel are of brick or cement, and the ends of the girders, which form the substructure of the bridge, rest upon these walls. Cross-

ties are laid upon the girders, and the rails are laid upon them. The girders are of iron, long enough to reach from wall to wall, and are several inches in thickness through their sides, and from top to bottom between 24 and 36 inches. It was these girders that were to be painted. In doing this work the painters stood upon a swinging platform, which was erected under the supervision of the foreman, Stoner. This platform was suspended from the superstructure of the bridge by means of ropes, and consisted of planks about ten inches wide and two inches thick, and so arranged that they could be raised and lowered by blocks and pulleys. The planks were placed lengthwise of the bridge, and enough of these planks were so placed to allow the workmen to work upon more than one girder at the same time. Plaintiff assisted in the erection of the platform, under the direction of Stoner, who was there all the time during the construction. He was the first man upon the scaffold at the time it was "tied off." Appellee, in this connection, testified:

"By 'tying off' I mean to fasten the rope; that is, to make it steady. * * * I went up to tie off at Mr. Stoner's direction. He sent me up there, and said to see if I could reach it; and I said, 'Yes;' and he said, 'Tie it off.' We pulled the scaffolding up as high as we could pull it, and then Mr. Stoner took my end and sent me up there to tie it off. At the height at which it was tied off it was convenient to work on with it that way; it was comfortable to work in; we could reach the girders all right from bottom to top."

Before the work of painting could start, it was necessary to free the girders from rust and dust. After the scaffold had been erected, plaintiff and his fellow servant Wesley Bonwell took their places on one of the planks, and Jim Hayes and George Wood, two other employés, got on another, and all began the work of removing the rust and dust from the girders, and while so engaged a wagon owned by the Falstaff Manufacturing & Mercantile Company, and driven by its servant, passed along on the street, through the tunnel, and the top of the wagon came in contact with the plank upon which plaintiff was standing, thereby causing plaintiff to fall to the street below, striking a wheel of the wagon in his descent, and he was thus injured. The wagon was a beer wagon, and had a cover over the driver's seat, the top of which cover was nine feet and three inches from the ground. None of the witnesses, in testifying to the height of the bridge above the street, place it as less than 15 feet. Appellee said it was about 16 or 20 feet from the bottom of the girder to the floor of the street.

One Tom Languish was a subforeman, or "straw-boss," under Stoner. When Stoner was away Languish would take his place and have charge of the crew and boss the gang. While appellee and the other employés were working on the scaffold at the time of the injury, Languish was standing on a ladder resting on the side of the wall and doing some work. Stoner was not present at the time the plaintiff was injured.

We will now proceed to show the evidence bearing upon the issue of whether appellant's foreman, Stoner, was guilty of negligence in the respect found by the jury. Appellee, among other things, testified:

"At the time I was injured I do not know where Mr. Stoner was. I left him under the bridge when I went up on the scaffold, under the scaffold, on one end. He was down in Third street there, under the bridge. I do not know whether he did or did not remain there all the time. While I was doing this painting and scraping on the girders of this bridge I did not think or believe there was any danger, because the boss was there. I thought the boss was under there. Mr. Stoner, the boss, was not working there. I expected Mr. Stoner to look out for my safety while I was up on the scaffold over the street. Mr. Stoner was the foreman. I had been in the employ of this company seven days at the time I was injured. Prior to this day that I went to work on the Third street bridge I had been working on the bridge across the bayou, below the Katy depot. I worked there about six days and three or four hours—about a week—over there; then I came over to this Third street bridge. This bridge that I say I worked on about six days across the bayou was not over any street at all.

"Mr. Stoner had authority to hire and fire the men. He employed me. The duties he performed were looking out for the men and telling a man what he had to do. At the time I went up on the scaffold there over Third street I did not know that Mr. Stoner was liable to go away from there while I was up on that board over the street, working. I did not know that he was going or that he would go away, and I did not know he had gone away at the time I was hurt."

It was shown by other evidence that appellee had been working on this scaffold about two or three hours before he was injured. Appellee further testified:

"I had been working there since 2 o'clock. We all put up that scaffold together. It was put up right; there was nothing wrong with it. I say Mr. Stoner was our foreman. He was the foreman that was all around about the work, telling the men what to do. He was at this place and that place, instructing us what to do. He was always around the work, at various places, telling us what to do; that was his business. I reckon that is the way he had always done before. I had been there just a week, you know. During that week he was there, telling us what to do, going showing a man what to do here, and going to show a man what to do there, and telling us what to do when he was there, but as soon as he was gone the straw-boss was there. When he was there, he was, and then he would go away entirely, and the straw-boss was there, he would take his place. He would be about the different parts of the work, instructing the men what

to do, and that is the way they do that work, and I knew that."

"Mr. Stoner was standing under the bridge when we finished putting up the scaffold. I do not know what became of him. I started to work then, and do not know what became of him."

Wesley Bonwell testified:

"We stood upon these planks as we did our work. I cannot te'l you how high that scaffold was from the girders we were working on. We pulled them up so that we could just reach the girder, and the girder is about two feet and a half, or maybe thirty inches, * * * and we stood on this, and it made it just right for us to reach our work when we pulled the blocks together. We pulled the blocks together. That is as high as we could get it; we could not have gotten it any higher.

"Mr. Stoner's duty out there was to see that the scaffold was put up properly and look out for his men, for the protection of his men, of course. I don't know what his duties are, what he signs up for, or anything like that. Mr. Stoner was working there all day with us. He was not on the scaffold with us, working on the scaffold. He was on the ground, looking to see if anybody got hurt, or anything like that, and watching around to see if there was anything he could do; he was willing to do it. He did not actually work on the scaffold with us at the time Mr. Gericke got hurt. I did not know at that time that Mr. Stoner was not there. He was not, in fact, there at that time, so I understand; he was there just a few minutes before that, and I do not know if he was gone at the time Mr. Gericke got hurt; he was there just a few minutes before that.

"I do not know that Mr. Stoner was not present at the time of the accident. He was there a few minutes before that, but where he was at the time of the accident I do not know. He was not up on the scaffold part of the time when the work was going on, instructing us, showing how the work should be done. He was up on top of the bridge sometimes, but not on the scaffold supervising the work. He was foreman. He might be over here one minute and over there the next, and if he had any work at the Grand Central he would be there next. That is the way he had been doing all the time. He is a fine man. He is not expected to be present all the time. You could not expect him to be present all the time, because the work calls him at different points. We men were working for him, and he put us to doing certain things, and expected us to do it, and, of course, he saw that the work was done, and saw that the men were performing the work. He was not expected to stand there over us all the time on the ground there. * * *"

"If some condition arose down there on the ground below the scaffold that made it dangerous to the men on the scaffold, the foreman would be more likely to know about that than anybody else, because he is used to putting up those scaffolds, and if there is any dangerous point at all, one bridge with another, he would certainly know it more than a working man would. I never noticed any difference in the condition of the pavement until after the man was hurt. A man on the ground is bound to see an approaching wagon that would not pass the scaffold, because, if he did not have anything else to do, he could see a wagon coming, and the man on the scaffold would be working. This bridge that we had suspended over there would clear a horse. I could not stand on the pavement and reach to the bottom planks of the scaffold."

Jim Hayes, a witness for the plaintiff, testified:

"I saw the happening of the occurrence resulting in his injury. We were working on this tunnel, and we had one swinging scaffold that was about 19 feet long, and another about 18 feet long. They were swung through the ties with a board taken up on the deck of the bridge, and rods shoved through loops, with our blocks and tackle swung in on them; the scaffold hung on with four of them. We were on the east side of the tunnel. We had two boards across these two scaffolds, reaching from one to the other, between 16 and 18 feet long, surfaced on both sides with $1\frac{1}{2}''\text{x}10''$. That was what we had to work on, to move backwards and forwards. At this time the scaffold was pulled up as high as we could have it to work on comfortably. I suppose that our heads were about three or four inches under the ties. After this scaffold was pulled up as high as we could get it, and when we got up there to work, we could not see either way from each end of the tunnel, on account of the girders and scaffolding, but we could see directly down under it, but not toward the north or south. If we let it down lower, we could not reach our work, and we had to pull it up so we could reach the work. We were invisible from our waists up, but from the waist down we were visible to parties below. I suppose that Gericke and I were about fifteen feet apart. The cross-boards that we had to work on projected over the scaffold from one and one-half to two feet. We were working on this scaffold, and the first thing I knew the scaffold was struck by something below, and, giving it a swing of about three feet, hit the board Gericke and West were working on. I was standing close to my block and tackle, and the shock threw me against it, and I grabbed my fall line, and that is all that saved me. This shock of the wagon hitting the scaffold knocked Mr. Gericke off. I saw him hit the wheel of the wagon and the ground.

"Mr. S. J. Stoner directed how the scaffolding should be built. The scaffold was erected, according to the methods which he directed to be used. He was foreman, and he exercised full control over all the details, and we were working under him, and did as he directed. My judgment is that the scaffolding was suspended about twelve feet above the ground. It may not have been quite so much, but about that; and it was suspended, in my judgment, about two or three feet from the bottom of the trestle under the track, by the trestle, meaning the girder. * * * I helped in the erection of the scaffolding. S. J. Stoner, the foreman, was there, helping in the erection of the scaffolding, and it was all done under his direction. I know whether this scaffolding was pulled up as high as it could be pulled with the means at hand. It was pulled up as high as it could be pulled, because the blocks were pulled togeth-

er, and for that reason it could not be pulled any higher; and if it had been pulled any higher, or built any higher, it would have been inconvenient to have worked on it. Those blocks of the scaffolding equipment were pulled together. The scaffolding could not have been pulled higher.

"I have worked under Mr. Stoner as foreman about five years. On the works Mr. Stoner always looked out for danger, and looked out for accidents, and evenings, when we quit, or at noon, he always looked to see if there was any fall lines hanging down or any boards loose on the track. He always looked to see if everything was in safety. At the time of the occurrence resulting in Mr. Gericke's injury I do not know, of my own knowledge, where Mr. Stoner was. I had seen Mr. Stoner last about an hour before the accident. He was there on the job at the time that I saw him, but what he was doing I do not know. My recollection is that the crew had been working at the bridge about 18 or 20 working hours at the time Mr. Gericke was injured. While the crew was doing their work on the bridge I do not know where Mr. Stoner had been.

"I had had experience, prior to the time of the accident, in using scaffolds similar to the one in use at the time of the accident, but I had never worked with the plaintiff before on such a scaffold. I am asked this question, 'Is it not a fact that the plaintiff would not have been injured had it not been for the striking of the board or plank which constituted a part of the scaffold by a wagon with a high or extended top over the same?' and I reply, 'I consider the answer to this question is to say that the wagon striking the scaffold is what knocked the plaintiff off and caused the injury.' I believe the wagon that knocked the plaintiff off was so constructed that it had an extra high top."

S. J. Stoner, appellant's foreman, testified:

"I remember an accident that happened out there in the tunnel on Third street, about January, 1916, in which Mr. Gericke got hurt. I was not present right at the time he got hurt. I was foreman. As foreman I see that the paint is in condition to be applied, and see that everything is rigged up in good shape, from one job to another. Sometimes I have two or three, and sometimes four, little jobs started. When I start to work one place, I generally see that they are all started all right, and then, if I have another job, I take two or three and go to that job, and then, in the course of an hour or two or three, perhaps, I may have come back to the first job. I go from one to another, and back to the cars, and like that. When Mr. Gericke got hurt we were cleaning and painting the girders across the tunnel."

"I saw the scaffolding and everything fixed up. The men put it up there. I helped them. After I got them all to working and the stage all right, I went to the Central roundhouse with some men. I may have been gone an hour and a half, something like that. Then I came back past there. I may have stayed there ten or fifteen minutes, probably, then. From there I may have gone down to the cars to get something, or to see about things, something like that. Those blocks were not pulled together. They could not be pulled together to where they

would touch each other. The girders would not allow it. I am speaking of the stage and the planks; they would strike the girders. The men, when they were working there, raised and lowered the plank as they saw fit for their convenience; they could raise it just as they liked. They usually did that for their own convenience."

"If a man were working under those girders, if a girder was this high, and he was working on this one in front of him, and he would have a girder of the same height four or five feet, or whatever the distance is, to the back of him, so that a man, standing up there, working on those girders, could not work on those girders and chop the rust off of them and paint them and watch up and down the road at the same time; that would be impossible, that is, if he was going to work. The scaffolding was absolutely all put up all right, in good shape. There was no danger of the scaffolding of itself falling down; it could not possibly fall down. The men put it up, and I was with them. I saw them put it up as high as it was convenient for them to work with it. We put it up a little higher than that. We put it just as high as they could work along there; at least, that would clear everything and everything would be safe. Everything was safe except this particular beer wagon, or some other wagon that was as high as a beer wagon would have the same effect as the beer wagon. Of course, that is a matter of argument. We could not pull those blocks entirely together for the reasons I stated. In other words, you could pull them so high, and before you would get the blocks together they would stop on account of the space taken up by the girders. I was not up on the scaffold that afternoon down here where the men were working on Third street. I did not go up on the scaffold. They could not pull it up any higher than it would go. If they pulled this stage up it came close, block to block, as close as they could do it, it it would be very inconvenient for them to stand there and work, and if they did it would clear everything. We have twice painted that bridge the same way. I saw it when they were working there, and it was all right.

"When I left there I had what they call a 'straw-boss.' His name was Tom Languish. He was working underneath, on the ladder. He might have been on top at times, seeing that everything was all right. His work all that afternoon was not up on top. When I left there and went away, I left Mr. Languish there underneath; if any of the ropes be down, or if they needed any paint, or anything, to hand it to them. When I left to go up to Bonner's Point, to the car, I could not say whether he was on the ladder or not, but he was there just the same. I may have passed him on top, or he may have come up to the top where I was and passed a few words and gone on down. Of course I do not know where Mr. Languish was, of my own knowledge, at the time the man got hurt; he would have to say that himself. When I would go away he would take my place; that is, he was the next man in authority. I had authority, if I wanted to hire men, if I needed them, and to fire them when they needed firing, and I had charge and control of the men, of course, and the work being done. Of course, when I put these men up there on this scaffold to work, to paint that bridge and

clean it off, why, of course, that is what I expected them to do; that is it exactly, and to do it right.

"I superintended the rigging up of that scaffold in the morning. I determined the height we would put the scaffold and tie it in so it would clear everything that would come along, the same as we did before; it would clear anything ordinary. I have lived in Houston twenty-three years. I am familiar with the wagons that use the streets of Houston. I am familiar with these wagons with canopy tops on the front, such as beer wagons, soda water wagons, and Texas Company wagons; I have seen them very often. I have seen them passing under this particular bridge. It cleared them always before; it would clear anything that would come along, that passed under, any time I was ever there. We put that scaffolding high enough to clear these wagons, of the character that I knew. We put it up so it would clear anything of that kind that came along. I could not tell you exactly whether I am familiar with the American Express wagons, but they have come under there time and again when we painted it before. I put it high enough to clear them. I warned them. They could raise and lower this stage if they wanted to do it, and I would caution them to leave it up as high as they could. I examined the scaffolding when it was in place, and it was of such a height as it would clear everything. When I came back after the accident I did not examine the scaffolding again. I did not look at it to determine how high it was. I do not know whether it had been raised or lowered. When they told me some one got hurt it surprised me so I did not understand how it happened. I do not know that other wagons had struck that scaffolding before the accident; no one told me that. In arriving at the height at which I put up the scaffold that morning, I just had it put up the way I had before. I would see wagons come through there, and it cleared everything; express wagons and numerous wagons. I do not remember a beer wagon coming through there. In fact, I was not just looking for a beer wagon. There was a brewery right on the corner. I was not looking for beer wagons around the brewery; I was not looking for any kind of wagon particularly.

"I did not place a watchman under that bridge to warn approaching vehicles or warn the men on the bridge. He was not there to watch the bridge, but if they needed anything to hand them up. You would not need any watchman for those scaffolds.

"Mr. Gericke never told me before he was knocked off of the scaffolding another wagon had struck the scaffolding and that they had to raise the planks to let it under. No one said anything to me about any one hitting the plank, or about the rigging of it. I do not know whether those men raised or lowered the scaffolding from the time I put it up in the morning; I could not tell. When I got back, after the accident, I saw the scaffold, of course. The scaffold was put up in the morning. I did not take particular notice to see whether the scaffold was just exactly the same height as when it was put up first, or not. I suppose it was. When the accident happened and I got back, I saw the scaffolding then. I did not take any particular notice about the scaffold

then. I could not say whether it was pulled up as far as it could have been or not; I do not know."

Tom Languish, a witness for defendant, testified:

"I was over here painting, or assisting in painting, a bridge over a tunnel in Third street, when Mr. Gericke got hurt. I was present at the time. Mr. Stoner was the foreman. As foreman, he would not always be at one place; he would be at other places. Sometimes he would have to go to the car or to other jobs; sometimes to the office. If he was gone for any length of time he would tell me and I would kind of look out for things. I was what is known as 'straw-boss' then, in his absence, to see that the men got what they wanted, to hand them paint, and such like. I did not see the accident. I was working on the side, on a ladder on the side of the tunnel, working in between, at the side. I saw the wagon that struck him afterward, after he fell, and I heard them halloa out. I looked and saw Mr. Gericke lying on the floor. I was in the middle of the tunnel, on the north side; that is the left-hand side, facing towards Houston. I saw the wagon afterwards. I did not see it when it hit, not until they halloaed out, and I looked and saw Mr. Gericke there and the wagon standing there.

"The scaffold was put up there or finished about noon. I do not know exactly what time it was, but somewhere about noon. It was put up by all of us there. Mr. Stoner was superintending it. The scaffold was put on block and tackle, used to raise and lower it. There was no watchman there at that time; we never used a watchman. There never had been a watchman there since I have been there."

"When Mr. Stoner would leave the job I would be the next man in authority. I was what is known as a subboss, or sometimes they called me a 'straw-boss.' When Mr. Stoner would leave, then I would have charge of the work.

"I assisted in putting up that scaffold. I could not tell exactly how high it was hung from the roadway. We put it up as it was supposed to be out of reach of anything. I was not familiar with the kind and character of wagons that would probably use that roadway. I knew that there are some beer wagons in Houston; I have seen them on the streets. There is a brewery on the corner there. I have seen beer wagons. The Houston Ice & Brewing Company is down the street. I have seen both of them use that tunnel, I suppose. I have seen all kinds of wagons passing under there. They had been passing all the afternoon. Our idea was to get that scaffolding up above all traffic; we thought we put it there. It was supposed to be put up above all traffic when we put it there.

"The men had a hitch there that they could raise or lower the scaffold as they wanted to. I do not know whether they did that or not. There was not anything about the scaffold to indicate that it would not clear the traffic. I did not notice the scaffolding after the accident. I could not say whether it was about where we put it, or whether it was lower or higher; I do not know. The men have a hitch there and can lower or raise it, just as they

want to. After the accident there was rope left that the scaffold could be pulled higher, but if they pulled it higher they would have to sit down. It could have been pulled higher than it was."

E. E. Cusick, witness for defendant, testified:

"The foreman that worked on it put the stage up, Mr. Stoner. Mr. Stoner's duty, at the time the men were working there, was to see that the work went on as it should. He went from place to place, stayed on one job, and when he had other business to attend to he went away after it was started. There was not any watchman there to watch. I knew that, and the men knew it at the time. I knew that there was no watchman there, because there was just these six men, four on the stage and myself and Mr. Languish on the top of the bridge."

"Sometimes Mr. Stoner does actual manual work around the jobs; he is supposed to see to the work. He is foreman, and he is supposed to see that the work goes all right. Most of the time he is supposed to look on and see that everything is going right. He don't do any actual work outside of possibly assisting to swing the scaffold, I don't think. I suppose it must have been along four or half past four or five o'clock that Mr. Gericke got hurt. We went to work at one o'clock. I think Mr. Stoner had been there all the time since we had gone to work until he went up to the car, but I do not know just how long after we hung the scaffold he went up. Anyway, he had been there all the time until he did go up to the car. I could not say whether he spent most of his time underneath or on top; he was around there. I do not know what he went to the car for.

"I was present when the scaffold was put up. I saw it about the time it was put up. I did not have anything to do with putting it up. The scaffolding was apparently above all traffic when it was put up, I should think. I saw it. There was nothing about the scaffolding to indicate that a wagon would strike it. I did not hear about a wagon striking it during the day before this one. I did not hear about that. I saw the man fall onto the wagon; as I looked over, he struck the hind part of the wagon, the hind wheel, and rolled off, just as I looked over. In other words, he must have fallen instantly, after the wagon hit. He hit the wagon underneath before the wagon could pull out.

"The stage or scaffold could be lowered and raised by blocks and tackle. Those blocks could not have been pulled together for the girders; the top block is hung on the tie, and the girders, I suppose, are eighteen inches. If you can raise a scaffold up close enough to the girder to sit down and scrape the rust off of the girder, I suppose you can sit on it and scrape them, that is, part of the girder, and the other part you could not. You could let it low enough to stand on it, and you could raise it high enough to sit on.

"As to whether a man, sitting down on the scaffold, under the girder, would have room enough under the girder for his legs, of course, and for free movement, depends on how you were to get to it. The girder is only about eighteen inches wide at the bottom. Of course you would necessarily have to sit on one side of it if you were painting, but if you were sitting on one side of it you would have to have room enough for your legs in order to get close enough to it. Now then, you could be doing that way, you might paint it down here, but you would have a great deal of difficulty in getting to it above; you would have to stand up to it. Then, in order to handle it that way, you would have to be continually raising or lowering your scaffold every time you wanted to change above; you could pull the scaffold up to where your head almost touched the ties, and raise or lower it. That is the way they were doing it. That is the proper and the usual way. Of course, a man can do a great deal more work standing up than sitting down. He could stand up and clean the top, and all he had to do was to lean over and clean the bottom of it. The foreman, Mr. Stoner, being in full charge and control of it, of course, could have had it done any way he wanted to. If he had told us men to sit down and do it, it would have been our duty to do it, although we would have gotten along ever so slow. If he had told them to stand up and do it, they could not have done anything else but stand up and do it. That was a matter that was in Mr. Stoner's control. I do not mean that it was Mr. Stoner's authority to tell them to stand up or sit down; he knows enough about the work to go ahead and do it to the best advantage. If he would tell them to do it, they would have to, but he does not tell them. As long as they are doing it right he does not tell them.

"I saw the scaffold after the accident. I helped them to take it down. There was rope left that they could use to pull the scaffolding up; there was forty or fifty feet of it. I suppose that there was about two and a half or three feet of space there under the bridge that they could have utilized to raise the scaffold higher if they had desired to do so."

John Hackendorn, witness for plaintiff, testified:

"I had just got there and had just looked up at the scaffold before the wagon hit it. I had seen the scaffold. It was hung there, up through the bridge, through the ties. I do not know whether it looked like it was high enough to escape traffic or not; it looked high enough to escape some of it. I did not have any idea from looking at the scaffolding about it being hit. It didn't look to me like it would be hit."

James Hayes, witness for plaintiff, testified:

"At the time and prior to the time the crew began work on the bridge, and before Mr. Gericke claims to have been injured, there was something said as to the members of the crew working upon the bridge looking or not looking for wagons or vehicles. We were talking among ourselves at the time, and said that the foreman ought to have a flagman below to look out for us fellows working there."

Appellee testified in rebuttal as follows:

"After I went up on the scaffold it was not lowered. It had not been lowered at all. There is not any doubt about that at all. I was working on the same stringer at the time I got hurt that I was when I went up. We had not moved the scaffold. I estimate that I was up there

about two hours when I was injured. I do not know exactly how far these girders are apart. I looked at them this morning when I went to town, and they are about four or five feet apart.

"One of the witnesses testified ·that there was some conversation there before I was hurt to the effect that the foreman ought to have a watchman there looking out for us. That was not said like ,that; there was nothing said like that. I did 'not engage in any such conversation, or hear anybody else engage in any such conversation, before I was injured. I do not know ·where the 'straw-boss,' Tom Languish, was at the time I was injured. I just saw him when I went up, before I started working; he was down there. I just saw him when I went up and went to work. I heard the witness testify as to where he was, to the effect that he was to the north of me, on the right-hand side, or the left-hand side of the tunnel—I don't know which—on a ladder. If he had been in that position I could not have seen him without getting down on my knees and looking under, so I do not know, as a matter of fact, whether he was or was not ·there. I did not know at the time I got hurt or at any time before I got hurt that there was nobody down on the ground keeping a lookout. I expected Mr. Stoner, the boss, to look out for my safety while I was engaged in that work. I did not know at the time I was injured, or beforehand, that the defendant company never used a watchman or never had anybody to keep a watchout. I had only worked for the company seven days, and over on the other side of the bridge. I testified that there was no occasion there for any watchout."

[1] We think that the evidence above shown was sufficient to authorize the following conclusions, to wit:

(a) That appellee and his fellow workmen, while performing their duties at the time of the injury to appellee, as had been directed by appellant's vice principal, were not in a position to look out for their own safety so as to avoid danger from vehicles that might be passing along Third street and under the tunnel bridge and liable to come in contact with the scaffold.

· (b) That there were several wagons in the city of Houston owned and operated by different owners, some of them in the immediate vicinity of appellant's bridge, of such height as to render it probable and likely that they would collide with said scaffold and do injury to the workmen thereon in the event some precaution was not taken by appellant or its vice principal to prevent such collision.

(c) That it was reasonably probable and likely that one of such wagons might pass along Third street and under said bridge at any moment while the workmen were on said scaffold, and that appellant's foreman and vice principal, Stoner, knew this, or would have known it in the exercise of ordinary care.

(d) That at the time of the injury to appellee no precaution was being taken by appellant, through its said vice principal or other agent, to protect appellee from danger of a collision between one of such wagons· and the scaffold on which he was working.

We think that it cannot be successfully denied that it was appellant's duty to take such reasonable precautions as were necessary to make the place where appellee was at work reasonably safe—that is to say, to enable him to discharge his duties there with a reasonable degree of safety to himself—and that this was a legal duty imposed upon appellant itself and was nondelegable. H. & T. C. Ry. Co. v. Stewart, 92 Tex. 540, 545, 50 S. W. 333; I. & G. N. Ry. Co. v. Hinzie, 82 Tex. 623, 18 S. W. 681; La Batte's Master and Servant (2d Ed.) vol. 4, § 1471; Rule Cotton Oil Co. v. Russell, 191 S. W. 802.

[2] But, aside from the duty resting upon appellant to use ordinary care to make the place furnished appellee reasonably safe for the discharge of the duties resting upon him, we think that the evidence in this case was sufficient to authorize the jury to find, as they in effect did find, that appellant's vice principal and foreman, Stoner, was guilty of negligence in leaving the bridge at the time he did so without notifying appellee or his fellow workmen of his departure, and without notifying the "straw-boss," Languish, as the evidence in the record shows it was said foreman's custom to do, and that such negligence on his part is attributable to appellant.· T. & N. O. R. R. Co. v. Walker, 58 Tex. Civ. App. 615, 125 S. W. 100; Sweeney v. G. C. & S. F. Ry. Co., 84 Tex. 433, 19 S. W. 555, 31 Am. St. Rep. 71; La Batte's Master and Servant (2d Ed.) vol. 4, § 1471.

[3] The jury found that appellant ought, in the exercise of ordinary prudence, as a means of maintaining appellee's place of employment reasonably safe, to have taken, or seen to the taking, under all the attendant circumstances, of some reasonable precaution, by lookout for vehicles, or by warning to appellee, to prevent a passing wagon, like the one which did the, injury, from striking the scaffold on which appellee was working in a manner to endanger his safety; and that appellant's failure to do so was negligence, and that such negligence was a proximate cause of appellee's injuries.

After very careful consideration of the entire evidence and the authorities cited in the brief of able counsel for appellant, we have concluded that the evidence was such as to warrant the jury's finding that appellant was guilty of negligence in the respect just stated; and, further, that such negligence was a proximate cause of appellee's injuries. City of Ft. Worth v. Patterson, 196 S. W. 251, and authorities there cited; S. A. & A. P. Ry. Co. v. Behne, 198 S. W. 680, and authorities there cited; Tel. Co. v. Long, 183 S. W. 421, 427, 428.

[4, 5] But it is strenuously and earnestly insisted by appellant that the peremptory instruction in its favor should have been given for the reason, as claimed by appellant, that the overwhelming weight and preponderance of the evidence, if not the undisputed evidence, established to such a degree as to render any other conclusion wrong that appellee's injuries resulted from a risk which he assumed.

At the common law the rule of assumed risk was well understood to mean that the employé or servant assumed not only all such risks as were usual and ordinarily incident to his employment, but also all other risks of danger of which he had knowledge, or of which he must necessarily have acquired knowledge while performing the duties of his employment with ordinary care, even though such additional or extraordinary risks arose on account of negligence of the employer. And in this state the rule of assumed risk is the same as it was known to the common law, except where abrogated or modified by statute. And in this case the defense of assumed risk was left available to appellant by the act of Congress known as the Federal Employers' Liability Act, for the reason that appellee, at the time he was injured, was repairing a railroad bridge of appellant over which interstate trains regularly moved. Seaboard Airline Ry. Co. v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; Railway Co. v. De Bord (Sup.) 192 S. W. 768; Hargrove v. G. C. & S. F. Ry. Co. (by this court) 202 S. W. 188.

[6] As we understand the contention of counsel for appellant on this proposition, they do not so much contend that appellee's injury was the result of a risk that was usually and ordinarily incident to the character of work in which he was engaged at the time of injury, but that if it should be conceded that appellant should have taken some precaution, such as keeping a lookout, through its vice principal or other agent, for wagons that might have been approaching said tunnel bridge, that nevertheless appellee, just prior to his injury, knew that no such lookout or other precaution was being taken, and that after he was fixed with such knowledge he continued the performance of his duties, and therefore must be held, as a matter of law, to have assumed the risk of danger that arose to him in consequence of the failure on appellant's part, through said vice principal or other agent, to keep a reasonable lookout for such wagons, or to warn appellee and fellow workmen of their approach.

It does appear from the undisputed testimony in the record that just about the time the employés working on this bridge had completed the scaffold on which they were obliged to stand while performing their duties one of the beer wagons operating in the city of Houston passed along Third street and under said tunnel bridge, and this wagon came in slight contact with the scaffold upon which appellee was standing at the time; but the evidence further shows that some one about the bridge halloaed just as the wagon came under the bridge, and that seems to have had the effect to prevent such contact between the wagon and scaffold as would have otherwise taken place, and such as would perhaps have resulted in injury to the employés on the scaffold at that time. The evidence also further shows that no injury whatever was done to any employé on the scaffold at that time, and the wagon passed on through after the scaffold was somewhat raised; and appellee testified in this connection that he was of the opinion that it was appellant's vice principal and foreman, Stoner, who had discovered the approach of the wagon that made this contact with the scaffold, and had halloaed either at the driver of the wagon or to the employés on the scaffold, with the view of preventing contact between the two and consequent injuries to those on the scaffold. The evidence is uncertain, in fact, as to who gave this warning when this wagon approached. Now, appellant's counsel seem to contend that, in view of the fact that this wagon had come in contact with the scaffold upon which appellee was working, he was thereby fixed with knowledge that his duties were attended with danger of collision with such wagons, and that he could not continue to remain upon the scaffold and perform his duties with such knowledge on his part without assuming the risk to which he was exposed and of which he must necessarily have known, and that in so remaining with such knowledge he assumed, as a matter of law, the risk which resulted in his injury from another wagon of the same kind, about three hours later.

Appellee, among other things, testified on the trial that he thought and relied upon the belief that appellant's foreman, Stoner, was keeping a lookout for wagons approaching the bridge in question, and that he did not know that said foreman had left the bridge at the time he did so, and did not know that the foreman had not notified the "straw-boss," Languish, of his departure, and that he, in fact, did not know what the "straw-boss" was doing or where he was after the foreman had gone, but was relying all the time on the assumption that the foreman would see to the protection of himself and fellow workmen on the scaffold, or would see that such protection was afforded by some one, as it was known to the foreman that appellee and his fellow workmen could not look out for themselves while performing their duties on the scaffold. It was also shown by another witness or two, by the witness Hayes especially, that it was customary for the foreman and vice principal to

look out for the protection of the employés generally in the discharge of their duties, and this does not seem to be denied in the record. It is true that the evidence shows that the foreman, Stoner, to use the exact language, "was here and there about the works," and that when he had gotten the men at work he would sometimes leave that point and go to another for a few minutes, and afterwards return. etc.; but the evidence is undisputed to the effect that the "straw-boss," Languish, always took the place of the foreman, Stoner, in his absence, and would act in his stead and discharge his duties during such absence. On this occasion the record fails to disclose what reason Stoner had for leaving the bridge, and also fails to disclose why it was that he did not notify the "straw-boss," Languish, of his intention to leave.

Under these facts and circumstances, as we have briefly stated them, we cannot say, as a matter of law, that appellee was not justified in assuming and in acting upon the assumption that foreman, Stoner, would keep a lookout, or see that such lookout was kept, for wagons that might be approaching the bridge in question, with a view to stopping such wagons before contact could be had with the scaffold, or with a view to warning appellee and fellow workmen to the end that they might protect themselves, notwithstanding the fact that a wagon on the same morning had come in light contact with the scaffold, as above stated.

[7] The defense of assumed risk, as interposed by appellant, was submitted to the jury by this question:

"Did the plaintiff know, or was it obvious or must necessarily have been known to him, in the ordinary discharge of his own duties, that the defendant railway company was taking or would take no precaution for his safety by lookout for vehicles such as the wagon in question, or by warning to plaintiff, as submitted to you in special issues Nos. 1 and 2?"

To this question the jury answered, "No." The special issues 1 and 2 to which this question referred were as follows:

"(1) Would a person of ordinary prudence on the occasion in question, in the relation the defendant railway company then occupied to the plaintiff, as a means of maintaining the plaintiff's working place reasonably safe, have taken, or seen to the taking, under all the attendant circumstances, of some reasonable precaution by lookout for vehicles, or by warning to plaintiff to prevent a passing wagon like that in question from striking the scaffold in a manner to endanger plaintiff's safety?"
. "(2) If such person of ordinary prudence would have done so, then did the defendant railway company fail on the occasion in question to take, or see to the taking of, any such precaution?"

To each of these questions the jury answered "Yes," and the jury further found, in answer to issue No. 3, that the failure of appellant to take the precaution submitted was negligence as defined by the court, and further found that such negligence was a proximate cause of appellee's injuries.

Now, as a counter-proposition by appellee on this point, it is contended that the only risk relevant to be considered as assumed was that applicable to the single ground of negligence found by the jury, which was itself sufficient for the judgment, and made the sole basis of the judgment; and that the assumption of such risk is expressly negatived by the verdict of the jury, and that the evidence is amply sufficient to support the verdict on that issue. Appellee then contends, by way of argument, that where the ground of negligence found by the jury is sufficient to support the judgment, assumed risk would have to be confined to that ground of negligence, making it immaterial to what extent the risks of independent grounds of negligence may have been assumed.

After due consideration, we have concluded that appellee's counter-proposition, as just stated, and his contention in that connection, are sound. Poindexter v. Receivers Kirby Lumber Co., 101 Tex. 322, 107 S. W. 42; see, also, T. & N. O. R. R. Co. v. Kelly, 98 Tex. 123, 80 S. W. 79; Railway Co. v. Murray, 156 S. W. 594.

[8] Upon the whole evidence we have concluded that it was sufficient to authorize the verdict of the jury convicting appellant of negligence in the respect as found by the jury, and that such negligence was a proximate cause of appellee's injuries, and also that it was sufficient to authorize the conclusion of the jury that his injuries were not the result of a risk of danger that he had assumed, and the first assignment of error raising these several questions is therefore overruled.

At the very threshold of the consideration of this case we concluded that the most vital, and in fact controlling, questions in the case were raised by the first assignment, which we have just discussed and overruled; and while we have considered the other assignments of error, which relate to the action of the trial court in refusing special issues and instructions, we feel sure that no error prejudicial to appellant has been shown by any of them, and that it would serve no useful purpose for this court to discuss them in detail, since none of them raise any new, or even debatable, legal question; and, on account of the length to which this opinion has already gone, we have to decline to further discuss them, but merely conclude by saying that we are of opinion that they should be overruled.

The judgment will therefore be affirmed.