**TEXAS & N. O. R. CO. v. GERICKE.**
(No. 233–3415.)

(Commission of Appeals of Texas, Section A.
June 8, 1921.)

**1. Master and servant ⊕⟿204(1)—Assumption of risk defense under federal act.**

In action for an injury to an employee engaged in painting a bridge used in interstate commerce, the common-law doctrine of assumed risk, if supported by the facts, is a complete defense.

**2. Master and servant ⊕⟿226(1) — Risk of master's negligence not assumed.**

An employee does not assume negligence of his employer as a risk ordinarily incident to his service.

**3. Master and servant ⊕⟿217(13)—Risk of unsafe place assumed by servant having knowledge of danger.**

An employee placed by his employer in a position where he could not guard himself against danger by any reasonable amount of care on his part can assume that his employer had made such provision for his safety as was reasonably necessary to protect him from injury, and was not required to use even ordinary care to see whether this had been done, and he can therefore be held to have assumed the risk of the master's failure to take such precaution only when he knew it had not been taken or when in the ordinary discharge of his duty he must have acquired such knowledge.

**4. Master and servant ⊕⟿217(16)—Risk of failure to give warning of vehicles not assumed by bridge painter on scaffold known to be too low.**

Though a railroad bridge painter, who was working on a scaffolding on the under side of a bridge over a highway, and could not see approaching vehicles, knew that the scaffolding was too low to permit high-topped wagons to pass under it, so that he assumed the risk of injury from that defect, such knowledge does not show assumption of risk by him of his employer's failure to have watch kept to give warning of the approach of vehicles if such watch was reasonably necessary for the employee's protection.

**5. Master and servant ⊕⟿288(5)—Assumption of risk question for jury.**

If the evidence shows with such certainty that reasonable minds cannot differ as to its effect that the employee knew or must necessarily have known in the ordinary discharge of his duties that his master was not taking precaution for his safety, the charge denying recovery on the ground of assumption ·of risk would be proper.

**6. Master and servant ⊕⟿280—Evidence held to show bridge painter on scaffold did not assume risk.**

In an action for an injury to a railroad bridge painter when the scaffolding on which he was working and which was hung under a bridge over a highway was struck by a wagon, evidence *held* to sustain the jury's finding that he did not know of the master's failure to have watch kept for approaching vehicles which would strike the scaffold, though it showed that shortly before the accident another wagon had struck the scaffold, but stopped before any injury was done when some one called a warning.

**7. Appeal and error ⊕⟿994(2)—Credibility of plaintiff as witness for the jury.**

The credibility of plaintiff as a witness and the weight to be given his testimony in view of his interest is ·for the jury.

Error to Court of Civil Appeals of Ninth Supreme Judicial District.

Action by Louis Gericke against the Texas & New Orleans Railroad Company. Judgment for plaintiff ,was affirmed by the Court of Civil Appeals (214 S. W. 668), and defendant brings error. Affirmed.

Baker, Botts, Parker & Garwood and McMeans, ·Garrison & Pollard, all of Houston, for plaintiff in error.

Presley K. Ewing, of Houston (L. E. Blankenbecker, of San Antonio, of counsel), for defendant in error.

GALLAGHER, J. Louis Gericke, defendant in error, brought this suit against the Texas & New Orleans Railroad Company, plaintiff in error, and two other corporations, to recover damages for personal injuries sustained by him while in the service of the railroad company and at work on a bridge belonging to said company which extended over and across Third street in the city of Houston.

The street at this point was about 30 feet wide, with cement walls on either side. The bridge was supported by iron girders, the ends of which rested on the respective cement walls. These girders had a perpendicular thickness of between 24 and 36 inches, and the cross-ties were laid directly upon them. The distance from the bottom of the girders to the surface of the street below was estimated by the witness to be between 15 and 20 feet.

Gericke belonged to a painting crew and was engaged at the time he was injured in cleaning the rust and dirt off the girders, preparatory to painting them. He was working on a scaffold swung by block and tackle from the cross-ties above. This scaffold had been erected only a short time before, under the personal supervision of one Stoner, the company's vice principal, and foreman of the gang in which Gericke ,was working. Stoner testified that it was placed as high up toward the bridge as the men. could work while standing on it, and higher than convenient to work upon, and that he thought it would clear everything. He had twice before painted the same bridge in the same way.

Gericke had worked for the company about a· week, but he was during that time

engaged in painting a bridge over the bayou, and there was no danger from passing traffic beneath it, When he was at work his view was obstructed by the girders, and he could not see vehicles approaching on the street from either direction. It was therefore impossible for him to discover their approach and protect himself from injury therefrom. After he began work, and before the accident, a high-topped wagon came along the street. It got right against the scaffold and somebody "hollered" and the wagon stopped. Then Gericke and the men working with him raised the platform to let the wagon pass. They then lowered it to the place where Stoner had directed it to be placed, and it was at that place when the accident in question occurred.

Stoner always looked out for danger and for accidents, and saw that the work, was left in proper shape when they quit in the evening. Stoner did not work on the platform, but was on the ground and all around the work. When he had left the work before, he had always left one Languish, the "straw boss," in his place.

Gericke testified that while he was so working he did not believe there was any danger because the boss (Stoner) was there; that he expected Stoner to look out for his safety while he was upon this scaffold over the street; that he did not know that Stoner was liable to go away while he was on the scaffold at work, nor that he had gone away at the time he was hurt.

Languish was on the work all the time. He did not work on the scaffold. He was on the ground or elsewhere about the work.

Gericke testified that he thought if Stoner should go away Languish would take his place and look out for his safety. There is no evidence that Stoner, when he left the work just a few minutes before Gericke was injured, advised Languish that he was leaving, or requested him to look after the work, or the safety of the men on the scaffolds. Stoner testified that he did not place a watchman under that bridge to give warning to approaching vehicles, or to warn the men on the scaffold; that he thought the scaffolds were high enough to clear the traffic, though he knew that high wagons like the one in question did use the street, and that such wagons had passed under the bridge when he had painted it before, but had always cleared the scaffolds.

About two or three hours after Gericke began work on this platform another high-topped wagon approached without warning, and struck the platform on which he was working, causing him to fall therefrom to the street below, from which fall he suffered permanent injuries.

The railroad company was engaged in interstate commerce, and the bridge in question was so used by it at the time.

Gericke sought recovery on the ground that the company, through its said vice principal, knew, or should have known, in the exercise of ordinary care, that the scaffold provided for him to work upon was liable to come in contact with passing vehicles, and thereby subject him to danger of injury, and that it was the duty of the company to keep a lookout for passing vehicles, or to maintain a watchman to do so, he being unable, in the discharge of his duties, to look out for himself, and that he expected this to be done, and thought it was done.

The railroad company answered by general denial and pleas of contributory negligence and assumed risk, alleging the use by it of the bridge in question in its business as a carrier of interstate commerce.

Gericke dismissed his suit against one of plaintiff in error's codefendants, and the jury acquitted the other of negligence, and the issues on this appeal are those arising between Gericke and the company.

The case was submitted to the jury on special issues and a verdict returned, which, as between Gericke and the company, finds as follows:

"(1) That a person of ordinary prudence, on the occasion in question, in the relation the defendant railroad company then occupied to the plaintiff, as a means of maintaining the working place reasonably safe, would have taken or seen to the taking, under all the attendant circumstances, of some reasonable precaution by lookout for vehicles, or by warning to plaintiff, to prevent a passing wagon from striking the scaffold in a manner to endanger plaintiff's safety; (2) that the defendant railroad company, on the occasion in question, failed to take or see to the taking of any such precaution; (3) that such failure on its part was negligence towards plaintiff, that is, a failure to exercise such care towards him as an ordinarily prudent person would have exercised under the same or similar circumstances; (4) that such negligence was a proximate cause of alleged injury to plaintiff; * * * (8) that the plaintiff, on the occasion in question, was not guilty of negligence as defined by the court, in not raising the scaffold high enough to clear vehicles, such as the alleged wagon, or in lowering the scaffold enough to come in contact with such vehicles; (9) that the plaintiff did not know, nor was it obvious, nor must it necessarily have been known to him, in the ordinary discharge of his own duties, that the defendant railroad company was taking, or would take, no precautions for his safety by lookout for vehicles, such as the wagon in question, or by warning the plaintiff, as submitted to the jury in special issues 1 and 2; (10) that $10,000 was fair and adequate compensation for the alleged injuries sustained by plaintiff on the occasion in question."

Judgment was entered in accordance with such findings.

The Court of Civil Appeals held that the findings of the jury were sustained by the

evidence, and affirmed the judgment. 214 S. W. 668.

Plaintiff in error makes no complaint of the findings of the jury to the effect that it was negligent in providing for the safety of defendant in error, that such negligence was the proximate cause of his injury, and that he was not guilty of negligence contributing thereto.

Plaintiff in error's first assignment complains of the refusal of its requested peremptory instruction, which is as follows:

"In this case you are instructed that the undisputed evidence shows that the plaintiff, at the time he was injured, was engaged in interstate commerce, and the undisputed facts show that he, while so engaged, assumed the risk, and that his injury was the result of one of the risks ordinarily incident to the business in which he was engaged, and it is further shown by the undisputed evidence that the plaintiff has failed to show by a preponderance of the evidence any negligence upon the part of the defendant, Texas & New Orleans Railroad Company, which was the proximate cause of plaintiff's injury. You are therefore instructed to return a verdict for the defendant, Texas & New Orleans Railroad Company."

[1] Plaintiff in error being engaged as a carrier of interstate commerce, and using the bridge in question in discharging its duties as such, the common-law doctrine of assumed risk, if supported by the facts, became available as a complete defense to this suit. Seaboard Air Line Ry. Co. v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, 1069, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; Chicago, R. I. & G. Ry. Co. v. De Bord, 109 Tex. 20, 24, 192 S. W. 767, 768.

[2] An employee does not assume negligence of his employer as a risk ordinarily incident to his service.

Mr. Justice Yantis, speaking for the Supreme Court in Chicago, R. I. & G. Ry. Co. v. De Bord, 109 Tex. 20, 23, 24, 192 S. W. 767, 768, says:

"The rule is too well settled to require the citation of authorities that under the common-law doctrine of assumed risk the plaintiff in a negligence suit does not assume any risks or dangers arising from the negligence of the defendant of which he has no knowledge; but it is equally well settled that at common law plaintiff does assume the risks and dangers caused by the negligence of which he did have prior knowledge."

[3] Defendant in error, having been placed by plaintiff in error, acting by its vice principal, at work in a place exposed to dangers from which he could not by reason of his necessary position in the discharge of the duties of his employment, guard himself by any reasonable amount of care on his part, had the right to assume that plaintiff in error had made such provision for his safety as was reasonably necessary to protect him from injury while so engaged, and was not required to use even ordinary care to see whether this had been done or not. Only when he actually knew that such provision for his safety had not been made, or when in the ordinary discharge of his duty he must necessarily have acquired such knowledge, can he be held to have assumed the risk of injury from such failure. M., K. & T. Ry. Co. v. Hannig, 91 Tex. 347, 351, 43 S. W. 508; T. & N. O. Ry. Co. v. Bingle, 91 Tex. 287, 288, 42 S. W. 971; Barnhart v. K. C., M. & O. Ry. Co. of Tex., 107 Tex. 638, 646, 184 S. W. 176; I. & G. N. Ry. Co. v. Hinzie, 82 Tex. 623, 630, 18 S. W. 681; Chicago & N. W. Ry. Co. v. Bower, 241 U. S. 470, 36 Sup. Ct. 624, 60 L. Ed. 1107, 1110.

The Supreme Court, in the case of Railway v. Hannig, supra, says:

"We understand the law to be that when the servant enters the employment of the master, he has the right to rely upon the assumption that the machinery, tools, and appliances with which he is called upon to work are reasonably safe, *and that the business is conducted in a reasonably safe manner.* He is not required to use ordinary care to see whether this has been done or not. He does not assume the risks arising from the failure of the master to do his duty, unless he knows of the failure and the attendant risks or in the ordinary discharge of his own duty must necessarily have acquired the knowledge. Bonnet v. Railway Company, 89 Tex. 72; Railway v. Bingle, ante p. 287." (Italics ours.)

The Supreme Court, in the case of Barnhart v. Railway Company, says:

"The plaintiff had the right to rely upon the master to furnish him a safe place to work, and he need make no inspection to ascertain whether the master has discharged this duty."

The Supreme Court, in the case of Railway v. Hinzie, says:

"It is true also that he [plaintiff] knew that cars would probably at any moment be switched onto the side track on which he was at work; but this would not necessarily, or even probably, import that he knew that appellant would neglect to give him adequate warning of their approach, and that it was hence unsafe for him to perform the work in obedience to his orders. The mere fact that he knew that cars would be probably switched in upon the side track would not preclude a recovery by him, unless he also knew that it was unsafe to continue his labors; and this was a question for the jury. Wood's Mast. & Serv. § 775."

[4] Notwithstanding defendant in error may have known that the platform on which he was working was hung too low to allow a wagon of the kind in question to pass under it without coming in contact with it, and might be held to have assumed the risk of injury incident to that defect alone, if a proper watch was kept, still, if he was ignorant of the fact that no watch was kept, and

the failure to keep such watch caused or contributed to his injury, then he could not be held to have assumed the risk resulting from such failure; such risk being one superadded to the risk assumed by the negligence of the company. Poindexter v. Receivers, Kirby Lumber Co., 101 Tex. 322, 325, 107 S. W. 42; T. & N. O. Ry. Co. v. Kelly, 98 Tex. 123, 135–137, 80 S. W. 79; Mo. Pac. Ry. Co. v. Somers, 78 Tex. 439, 442, 443, 14 S. W. 779; Chicago & N. W. Ry. Co. v. Bower, 241 U. S. 470, 36 Sup. Ct. 624, 60 L. Ed. 1107, 1110.

In the case of Poindexter v. Receivers, supra, plaintiff was injured by a rivet from a leather belt striking his eye by reason of the breaking of such belt. He alleged negligence in using an old and defective belt and in using a defective pulley. There was evidence from which the jury might have found that, if the belt was defective, plaintiff knew of the defect, but the evidence, on the other hand, tended to show that he was justifiably ignorant of any defect in the pulley. Discussing the doctrine of assumed risk, as arising out of these circumstances, the Supreme Court says:

"But, if the belt was a safe one, and the danger of its breaking and throwing off such objects, when used upon proper pulleys, was one of the ordinary risks of the service which plaintiff assumed, this would not include an assumption of the risk caused by defendant's negligence in having a defective pulley, if it caused the belt to break. Or, if it were shown that the belt was defective, and that plaintiff knew of its condition and assumed the risk incident to such defect alone, still he would not be precluded from recovering, if the defective condition of the pulley caused or contributed to his injury. Missouri Pac. Ry. Co. v. Somers, 78 Tex. 442, 443; Texas & N. O. Ry. Co. v. Kelly, 98 Tex. 137. The risk resulting from the defective pulley would be one superadded by the defendant's negligence to that assumed, and for an injury caused or contributed to by it the defendants would be liable."

The recovery by defendant in error in this case is predicated on a finding by the jury that plaintiff in error was negligent in failing to take some reasonable precaution by lookout for vehicles, or by warning to him to prevent passing wagons from striking the scaffold on which he was working in a manner to endanger his safety, and that such failure to take such reasonable precaution was the proximate cause of his injury.

Whether the injuries received by defendant in error resulted from a risk assumed by him under this state of the record depends on whether he knew of the failure of the company to take such precaution; if he did know such fact, he assumed the risk of injury therefrom, but, if he did not know such fact, he did not assume such risk.

The jury found that defendant in error did not know, that it was not obvious to him, and that it was not necessarily known to him, in the ordinary discharge of his own duties, that plaintiff in error would take no precaution for his safety by a lookout for vehicles, such as the wagon in question, or by warning to him. The Court of Civil Appeals held the evidence sufficient to support such finding. The real issue raised by this assignment, therefore, is whether there is any evidence to sustain such finding.

[5] If the evidence shows, with such certainty that reasonable minds cannot differ, as to its effect, that the defendant in error knew, or must necessarily have known in the ordinary discharge of his duties, that plaintiff in error was not taking, or would not take, precaution for his safety by keeping a lookout for passing vehicles, or by warning to him, then the charge under consideration should have been given; otherwise it was properly refused.

[6] We have reviewed the entire evidence in this case. The application for the writ of error adopts for its statement of facts the facts as recited by the Court of Civil Appeals in its opinion in this case. The Court of Civil Appeals held in accordance with the verdict of the jury that the defendant in error did not know such precautions for his safety were not being taken, but, doubtless through oversight alone, failed to recite all the testimony.

Plaintiff in error seems to rely for its proof of such knowledge on the fact that a high-topped wagon had passed under the bridge a short time before the accident, and that defendant in error assisted in raising the platform to let the wagon pass and in then lowering the platform to the place it occupied before.

Defendant in error testified on this identical point as follows:

"During the time we were putting it up one wagon struck it while I was working awhile on there. It just got right against it, and somebody hollered, and the wagon stopped. It was too low then, and I saw it when the wagon struck it. Nobody was hurt at that time; it never hit it hard to hurt anybody. I was standing on one of the planks then. When they hollered, the wagon stopped, and we raised this board and let them go through and then we put it back. The scaffold had not been raised or lowered while I was working on it. It remained at the same place where I put it under the direction of my foreman. I do not know how [high] the scaffolding was above the street. * * * I think it was a good while after the first wagon hit it before this wagon hit it. I continued to work on the scaffold. No other wagon hit it. Mr. Stoner was standing under the bridge when we finished putting up the scaffold. I do not know what became of him. * * * I think I worked about two hours before I was hurt, about a couple of hours. When the first wagon struck the girder I had my head alongside of the girder. I did not stop and get down. I did not see the wagon. Somebody just hollered, you know, and

the wagon was right against it there. I did not go on working. We raised the board. We stopped working and got under the girder. I could see the wagon and the street then. I do not know where Mr. Stoner was then. I do not know whether he was there or not. The fellow that was working with me said, 'Raise it and let him get over.' * * * I say that one wagon came along there, and that somebody hollered, and that Bonwell and I raised the plank and let the wagon go under. The hollering came from on the ground there under the bridge. I do not know who it was that hollered. I thought Mr. Stoner was down there watching under there, keeping a lookout for wagons that would pass under. The connection I thought Mr. Stoner had with this hollering at the time this first wagon passed under there when we raised the plank was to stop it so it would not knock me off. * * *

"I did not know, at the time I got hurt, or at any time before I got hurt that there was nobody down on the ground keeping a lookout. I expected Mr. Stoner, the boss, to look out for my safety while I was engaged in that work. I did not know at the time I was injured, or beforehand, that the defendant company never used a watchman, or never had any body to keep a watchout. I had only worked for the company seven days, and over on the other side of the bridge. I testified that there was no occasion for any watchout."

[7] The credibility of defendant in error as a witness and the weight to be given to his testimony as one of the parties in interest was for the jury. The jury found that he did not know that no precaution was taken for his safety, and we cannot say that there is no evidence to support such finding. Neither can we say that the evidence shows with such certainty that reasonable minds cannot differ as to its effect that he did know that plaintiff in error was taking, or would take, no precaution for his safety by lookout for vehicles, such as the wagon in question, or by warning to him.

This case is very similar to the case of Grace & Hyde Co. v. Kennedy, decided by the United States Circuit Court of Appeals for the Second Circuit, and reported in 99 Fed. 679, 40 C. C. A. 69. In that case the defendant was constructing a shed over the width of the sidewalk on one side of an avenue in the city of New York. In consequence of the extent of the public use of the street in the daytime, the work was done at night. Two derricks were employed in placing the material used in constructing the shed in proper position. These derricks were secured by guy lines extending across the avenue. About 5 o'clock in the morning a mail van came along this avenue and struck one of the guy lines, causing it to sway and knock the plaintiff from his position to the ground, from which fall he suffered injury.

The case was presented to the jury by the plaintiff upon the theory that, inasmuch as the work was necessarily done at night upon a street which was frequently occupied by passing vehicles of various kinds, and as the necessary guy ropes which extended into the street must be fastened where they were in danger of collision with a passing vehicle, if unobserved in the darkness by the driver of the vehicle, it was the duty of the defendant to take such precaution against injury to his employees as to render the place of their work reasonably safe. The defendant, among other defenses, relied on assumed risk. There was a verdict for plaintiff, which on appeal was affirmed. The issue of assumed risk was disposed of by the court in its opinion as follows:

"The subject which is contained in the defendant's assignment of error that the plaintiff assumed the risk of his position and of the conditions as they existed was fully considered in Railway Co. v. Archibald, 170 U. S. 665, 18 Sup. Ct. 777, 42 L. Ed. 1188, and it is sufficient to say that the plaintiff did not assume the risk of the employer's neglect to furnish a reasonably safe system of protection against the danger from injury by passing vehicles, and that there is no adequate evidence that he continued to remain at work with the knowledge of the insufficiency of the protection which was actually furnished. The judgment is affirmed, with costs."

We therefore hold that the peremptory charge requested by plaintiff in error was properly refused.

The other assignments in the application for writ of error in this case are controlled by the provisions of law above set out, and the authorities cited in support of the same. We have carefully considered all of such assignments, and in our opinion they present no reversible error.

We therefore recommend that the judgment of the Court of Civil Appeals in this case be affirmed.

PHILLIPS, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.