## CITY OF AUSTIN v. JOHNSON et al.
### No. 9538.

Court of Civil Appeals of Texas. Austin.
May 22, 1946.

Rehearing Denied June 12, 1946.

House, Mercer, Edwards & Irvin, R. L. House, and Raymond Edwards, all of San Antonio, for appellant.

Polk Shelton, Looney & Clark, Everett L. Looney, and Donald S. Thomas, all of Austin, for appellees.

BLAIR, Justice.

Appellees, Mrs. Vera Johnson, for herself and as next friend of her minor children Edith and Lillian Johnson, sued appellant, the City of Austin, for damages for the death of Edward C. Johnson, the husband and father of appellees, which resulted from his coming in contact with electricity while going upon the steel structure of appellant's substation to replace a broken insulator or jumper. His death was alleged to have been caused by the negli-

gent failure of appellant and its employees (1) to disconnect the wires carrying electricity to and into the southeast corner of the substation before ordering Johnson to remove the jumper from its southwest corner; and (2) to inform him at the time that electricity was coming down the wires to and into the southeast corner of the substation. The jury found each of these acts to be negligence and a proximate cause of Johnson's death; and upon these and other findings judgment was rendered for appellees for a total of $34,680 damages, apportioned among them as found by the jury.

■ Appellant contends (Points 1 to 5) that no evidence was adduced showing that Johnson met his death by coming in contact with electricity at the substation; and, if so, it raised a fact issue for the jury; and appellees not having requested its submission waived this controlling ground of recovery.

Neither of these contentions is sustained.

Johnson was employed by appellant as a trouble shooter. He had never before worked at the substation. At about 5 a. m. on June 13, 1943, A. S. Higgins, appellant's superintendent in charge of the substation, ordered Johnson to replace a broken insulator or jumper on top of the steel structure of the substation at its southwest corner. A few moments later Higgins saw Johnson falling from near the top of the steel structure at its southeast corner. When asked on direct examination, "what, if anything happened to him (Johnson) on that early morning of June 13, 1943, at the East Substation," Higgins replied that "he was killed by coming in contact with the energized wires and conductors at the substation." At the time the wires coming to and into the southeast corner of the substation were energized with or carrying 4,000 volts of electricity, enough to kill a man, if he came in contact with it. This was the only part of the substation structure that was energized, and several other employees of appellant were working on the structure at the time.

Employee Muston testified that he saw Johnson falling from the substation structure, "coming from towards the top" and ⸺lling to the ground, "close to the south-

east corner." That some few minutes later, just after they had taken Johnson to the hospital, Higgins told witness that "it was all my fault, Muston, I sent him up into that hot stuff."

Employees Pryor, Robinson and Rountree, who were working on the substation structure and saw Johnson when he was either falling or lying on the ground at the southeast corner of the substation, testified to such facts and that artificial respiration was given Johnson from about thirty seconds after he fell continuously for about one hour and forty-five minutes, until he was pronounced dead at the hospital, without his having regained consciousness.

Higgins phoned his immediate superior, Ashford, who testified:

"Q. And what did Mr. Higgins say? A. Mr. Higgins said: 'Ash, I am in serious trouble.' I said, 'What is the matter?' He said, 'I think I have killed a man.' I said, 'Who was it?' And he said, 'Johnson,' and I said, 'Did you work on him?' He said, 'Yes, we are working on him now.' I said, 'Where are you?' And he said, 'I am at the hospital.' I said, 'I will be right down.' So I got in my car and went down."

Ashford further testified that when he reached the hospital Higgins was in "a very emotional condition, · like he was almost hysterical." Ashford then worked with Johnson until he was pronounced dead.

Higgins testified that when he sent Johnson upon the structure to fix the insulator or jumper he appeared to be strong, robust, able-bodied and in good health.

Appellee Mrs. Johnson testified that when her husband went to work at 11 p. m. he was in good health, strong and robust; that she saw him the next morning at about 6 a.m. at the hospital; and that he was dead.

A certified copy of Johnson's death certificate was placed in evidence, which stated ·he met "accidental death due to electrical shock."

We think the foregoing evidence conclusively showed that Johnson met his death by coming in contact with appellant's energized wires at the top southeast corner of the substation structure. Higgins, appellant's superintendent, so testified. He

was a skilled electrician and knew that the wires at the point from which he saw Johnson falling were carrying 4,000 volts of electricity, enough to kill any man if he came in contact with it. Higgins and the other employees of appellant who saw the accident tried to revive Johnson by artificial respiration; but he died without regaining consciousness. These were facts which came directly within the view and knowledge of the witnesses, and from which only one conclusion could reasonably be reached, that Johnson met his death by coming in contact with electricity coming from the wires and conductors thereof at the top southeast corner of the substation structure of appellant.

The law is settled that one experienced in the science of electricity may testify as an expert not only to the facts coming within his view or knowledge, but may also testify as to his opinion respecting a given state of facts. United States Fidelity & Guaranty Co. v. Rochester, Tex. Civ.App., 281 S.W. 306, affirmed 115 Texas 404, 283 S.W. 135.

The fact that Higgins could not or did not see the electricity enter the body of Johnson, or did not see any burns on his body, did not render his testimony that Johnson met his death by coming in contact with electricity from the wires of appellant a mere conclusion of the witness. The existence of the conditions giving rise to the accident was fully known to Higgins and the other employees of appellant, and each of them saw the accident. They each knew that there was sufficient electricity coming over the wires near the place they saw Johnson falling from the structure, and they saw him die without regaining consciousness, after each of them had attempted to revive him by artificial respiration, the treatment given one who has received an electrical shock. There was no evidence indicating that his death resulted from any other cause. If these witnesses had seen some person shoot at Johnson with a gun and had seen him fall and die, they could have testified to such facts although they did not see the bullet enter his body. In the instant case the existence of the conditions giving rise to the accident was shown without dispute, and we think such conditions conclusively show that Johnson met his death by coming in contact with the electrically energized wires and conductors near the top southeast corner of appellant's substation structure.

If the foregoing evidence were not sufficient to conclusively show that Johnson did so meet his death, it was amply sufficient to sustain a presumed finding of the trial judge that he did so meet his death in support of the judgment rendered.

It was alleged that Johnson met his death by coming in contact with the energized electric wires at the southeast top corner of appellant's substation structure, and as the result of the negligence of appellant (1) in not disconnecting the wires; and (2) in not warning Johnson of them before ordering him to go up on the structure to replace the broken jumper. The jury found that each of these acts was negligence and a proximate cause of the death of Johnson. No issue was submitted to the jury as to whether Johnson met his death by coming in contact with the energized wires. Under our foregoing holding that the evidence conclusively showed that he did meet his death in this manner, it was not necessary to submit such issue. There was no evidence indicating that his death resulted from any other cause.

But if the evidence were not conclusive that Johnson so met his death, no reversible error appears, because of not submitting such issue to the jury. Neither party requested the submission of the issue and neither party objected to the charge because it did not submit the issue. The foregoing evidence is amply sufficient to sustain a presumptive finding of the trial judge in support of the judgment rendered that Johnson did meet his death by coming in contact with the energized electric wires of appellant. Manifestly the question of whether Johnson so met his death was but one of the constituent elements of each of the two foregoing grounds of recovery; and in absence of a request for an issue to be submitted thereon, the trial court was justified in and is presumed to have found the issue in support of the judgment rendered. Rule 279, T.R.C.P.; Wichita Falls

228

& Oklahoma Ry. Co. v. Pepper, 134 Tex. 360, 135 S.W.2d 79; Texas Employers Insurance Association v. Miller, 137 Tex. 449, 154 S.W.2d 450; Clowe & Cowan v. Morgan, Tex.Civ.App., 153 S.W.2d 863; Northern Ins. Co. v. Molloy, Tex.Civ.App., 146 S.W.2d 231.

We overrule appellant's Point 6 that the court erred in admitting the death certificate of Johnson in evidence. Under our foregoing holdings the questions relating to the introduction of the death certificate become immaterial.

We also overrule appellant's Points 7 and 8 that the court erred in admitting in evidence the testimony of A. S. Higgins, appellant's superintendent in charge of the substation, that Johnson met his death by coming in contact with electricity coming to and into the southeast top corner of the substation structure. As hereinabove pointed out, he testified to facts rather than conclusions, and the court did not err in permitting him to testify that Johnson "was killed by coming in contact with * * * the energized wires and conductors at the substation." McCormick & Ray, Texas Law of Evidence, p. 786, § 626.

Appellant's Points 9 and 10 do not present error. By Point 9 it is contended that the court erred in permitting witness Muston to testify that Higgins said to him, "it is all my fault, Muston, I sent him up into that hot stuff." By Point 10 it is contended that the court erred in permitting Ashford to testify that Higgins told him over the telephone and at the hospital that he had killed a man by the name of Johnson, and that it was all his (Higgins') fault.

Higgins was the superintendent in charge of substation work. He ordered Johnson to go upon the structure to replace a broken jumper. He knew that electricity sufficient to kill a man was coming into the wires at the southeast top corner of the substation structure. Johnson had never before done any work on the substation. Higgins did not tell him how to reach the southwest top corner of the structure to replace the broken jumper, and did not warn him of the electricity coming into the southeast top corner of the structure. Higgins' statements both to Muston and Ashford, the latter being Higgins' immediate superior, were in explanation of how the accident happened. They were admitted in evidence under the rule of res gestae. The admissibility of such statements of an agent against his principal is predicated upon the theory that such statements constituted a part of the res gestae of the transaction in which the agent engaged in behalf of the principal. And such statements are admissible to show knowledge or notice on the part of the principal of the existence of conditions giving rise to the accident. 20 Am.Jur. 507 and 573, §§ 596 and 676.

The statements of Higgins were not too remote in point of time. The one made to Muston was made about fifteen or twenty minutes after the accident, and just after the ambulance had taken Johnson to the hospital. Higgins blamed himself for having caused the accident, and at the time he made the statement to Muston he was "pretty well excited * * * taking the thing hard * * * hurt pretty much as a result of it," and made the statement while Muston was "seeking to console him," and after artificial respiration had failed to revive Johnson.

The statements made by Higgins to Ashford over the phone and at the hospital were made while Johnson was still living and being given artificial respiration, or about the time he was pronounced dead. Ashford was Higgins' immediate superior, and Higgins' reason for making the statements was to tell Ashford what had happened and how the accident occurred. Higgins was necessarily excited because, as he stated, "I think I have killed a man." According to Ashford, "he was in a very emotional condition, like he was almost hysterical," and while so distressed because of the accident Higgins did not wish to return to the substation, stating "I can't go back; I can't go face the fellows because they know it is my fault."

It is true that in the application of the rule of res gestae the element of proximity of time of the statement to the startling event is important, but the rule does not depend alone upon proximity of time. The declaration is generally admissible where the declarant is still dominated by

emotion because of the happening of the startling event, and the admissibility of the statement is necessarily controlled by the particular circumstances of each case. The authorities hold that:

"The whole problem is one for the trial judge to determine as a preliminary question of fact conditioning the admissibility of the declaration, and one which he obviously ought to have considerable latitude in deciding. Only in case of extreme and apparent abuse should his ruling be disturbed on appeal." McCormick & Ray, Texas Law of Evidence, p. 549.

 The rule has been applied to statements made one, two, four, or even five hours after the occurrence of an accident. Texas Employers Ins. Ass'n v. Shifflette, Tex.Civ.App., 91 S.W.2d 787 (writ dismissed); Worley v. International Travelers Assurance Co., Tex.Civ.App., 110 S.W.2d 1202; Houston & T. C. Ry. Co. v. Brooks, Tex.Civ.App., 294 S.W. 282; 18 Tex.Jur. 301, § 185. The foregoing statements of Higgins each related to the manner or cause of the happening of the accident, and were each a continuation of that event, and the startling event was simply voicing itself through the witness. The statements were admissible under the rule of res gestae as fully reviewed and reiterated in the recent case of City of Houston v. Quinones, 142 Tex. 282, 177 S.W.2d 259.

 By Points 12 to 16 appellant contends that there is no evidence showing that any negligent act of appellant caused the death of Johnson; and by Points 17 and 18 it contends that there is no evidence showing that any negligent act of appellant was a proximate cause of the death of Johnson.

Appellees alleged that appellant failed to provide a safe place for the deceased Johnson to work, and in substance that his death was caused by the negligent failure of appellant (1) to disconnect the energized wires at the southeast corner of the substation structure before ordering Johnson to go upon the structure to replace the jumper; and (2) to inform him at the time he was ordered to replace the jumper that electricity was coming down the wires to and into the top southeast corner of the structure. The jury found in answer to Special Issues Nos. 1 to 4 that each of these acts of appellant was negligence and that each of such negligent acts was a proximate cause of the death of Johnson.

The evidence fully supports the jury's finding on each of these issues.

Johnson had been employed by appellant for several years as a lineman and for several months immediately prior to his death as a "trouble shooter," in which work he was shown to be a careful and efficient electrician. His duties as a trouble shooter did not ordinarily require any work of him in or about the substation structure here involved. He had on one previous occasion, when the substation was being normally operated, done some work thereon under the orders of Robinson, appellant's foreman in charge of work on the substation, who advised him at the time what part was "hot" and what was "cold," and stood by and directed Johnson as to how he should do the work assigned. On the occasion of his death Johnson had just returned from a call outside in his regular line of work as a trouble shooter. The substation was not being used at the time to serve electricity to the public, but was undergoing changes and repairs. It was dead or de-energized at all points except the top southeast corner, where 4,000 volts of electricity were coming over the wires and conductors. This electricity was serving no purpose at the time. All of the transformers were dead and the substation had never before been operated as it was at the time Johnson met his death. Men were at the time changing and repairing the substation at several places. There was no warning by signs or otherwise that the top southeast corner was energized.

Higgins was the superintendent in charge of the substation. Robinson was the foreman in charge of the work of changing and repairing the substation. Shortly after Johnson returned to the substation building from answering a trouble call, Higgins took him to the door on the south of the building, and asked Robinson, the foreman, if he were ready to have the jumper removed. Robinson replied that he was,

and Higgins then took Johnson to the southwest corner of the substation structure and pointed out the jumper on top of the structure, and told Johnson to remove it. Higgins told Johnson that the southwest corner was dead or not energized with electricity, but did not tell him anything about the southeast corner being energized, nor did he tell Johnson how he should go upon the structure. Higgins then went under the structure and was looking at some switches, when in a few moments he heard a groan or a noise and looking up he saw Johnson falling from near the energized top southeast corner of the substation structure. Johnson died some hour and a half later, after artificial respiration had been continuously given, and without having regained consciousness.

Neither Higgins nor Robinson told Johnson that the southeast top corner of the substation was energized, and neither told him how to reach the southwest top corner to do the work there ordered done.

The frame of the structure furnished an easy way up at the southeast corner of the structure, where the greatest distance between any step was two feet. At the southwest corner of the substation the first step on the structure was five feet and eight inches from the ground. Thus it was shown that the easiest way to the top of the structure was up the southeast corner, and then across the top twelve feet and nine inches to where the jumper was to be replaced. There was only one ladder at the substation and it was in use at the time by others, and was lashed down at the northeast corner of the structure.

The evidence showed that there were two methods by which the electricity coming to and into the southeast corner or bay of the substation structure could have been de-energized or disconnected. The "jumper" removal method at points where the wires made right angle turns could have been made within from fifteen to forty-five minutes. The "hot line stick" method could have been made within from ten to fifteen minutes. The evidence showed that the electricity coming into the southeast corner of the structure was not being used, and that the wires could have been disconnected at the time of the accident without loss of service to any customer of appellant. Several witnesses, experienced and expert in the matters of handling high voltage electricity during construction work or repairs on a substation, testified that the safe practice was "kill" all the substation structure.

Witness Persons, an experienced electrician, testified as an expert in behalf of appellees. Based upon hypothetical questions incorporating the foregoing facts and circumstances as to general changes and repairs being made on the substation and with men working at several places thereon, and the electricity not being in use at the time, Persons testified:

"* * * then my opinion is, and it is definitely a safety rule, they should have disconnected the whole structure, rather than leaving a portion of it hot and a portion of it cold during the period in which the substation was performing no duty and was not in use in carrying customer's loads."

In answer to another hypothetical question Persons explained the two methods by which the electricity could have been disconnected from the southeast corner of the substation and the necessity therefor under standard safety practices, as follows:

"As you have described it, there could have been two things done to have accomplished the emergency use of the line and still kill the entire structure. There could have been a disconnect switch mounted on this pole, or an intermediate pole, or there could have been what we call in electrical terms hot line clamps that could have been handled with hot line tools, which is a long stick that you can go up and hang a hot line clamp on the wire and close it up and go ahead and carry current on it. Either of those things could have been installed somewhere beyond the point where this low voltage line was tapped on this during the emergency period when they were using the 11,000 volt line for a 4,000 volt line. * * *

"Q. Then is it your opinion that standard safety practice and good engineering practices, assuming the circumstances as stated to you to be true, that the split bolt clamps for the emergency should have been

substituted for by the use of hot-line clamps; that is one way? A. That is definitely my opinion; and that is in my opinion, made more necessary in order to follow safety practices by the fact that you are using on this job men that were not wholly accustomed to doing work on a substation structure. That is you pick up a man out of the crew that does normally nothing else, and you bring him into the structure and work him under conditions like this, it is more necessary to kill the entire structure, and it necessarily puts more responsibility on the supervisor if he sends him up into the partially hot and partially cold structure to caution him each time he goes up the structure, rather than depend on his memory that the structure is hot from previously telling him that. That is my opinion of the proper procedure in this case."

The first act of negligence alleged was that appellant failed to exercise ordinary care in furnishing Johnson a safe place to work, because it negligently failed to disconnect the energized wires before ordering him to go upon the structure to replace the broken jumper. The foregoing evidence fully supports the jury's finding on this issue.

■■■ The duty of any corporation is to furnish its servant or employee with a reasonably safe place to work. This is a nondelegable duty. It applies to both skilled and unskilled employees. "The measure of this duty is the use of ordinary care." Texas Company v. Strange, 62 Tex.Civ.App. 642, 132 S.W. 370, 371; Fort Worth Elevator Co. v. Russell, 123 Texas 128, 70 S.W.2d 397; El Paso Electric Ry. Co. v. Buttrey, Tex.Civ.App., 260 S.W. 897; Southwestern Tel. & Tel. Co. v. Luckie, Tex.Civ.App., 153 S.W. 1158; Standard Light & Power Co. v. Munsey, 33 Tex.Civ. App. 416, 76 S.W. 931.

The second act of negligence alleged was that appellant failed to warn Johnson in any manner that the southeast corner of the substation structure was energized with electricity before ordering him to go upon the structure and replace the broken jumper. This rule of duty is closely akin to the rule making it the duty of the employer to provide a reasonably safe place for the employee to work, and is by some authorities regarded as merged into or as a part of such rule.

In Hume v. Ft. Halifax Power Co., 106 Me. 78, 75 A. 300, 303, 138 Am.St.Rep. 332, the court say:

"It is too well settled now to admit of discussion that one of the duties which an employer of labor assumes toward his employe is to exercise reasonable care and diligence to provide a reasonably safe place at which the employe is to work. And, moreover, the law implies that the discharge of this duty requires the master to notify his servant of any and all special risks and dangers of the employment, and of all dangerous conditions attendant upon the place of the exercise of the employment, of which the master has knowledge, or by the exercise of reasonable care would have knowledge, and which are unknown to the servant, and would not be known and appreciated by him if in the exercise of reasonable care on his part."

In Texas City Transportation Co. v. Winters, Tex.Com.App., 222 S.W. 541, 543, the court say:

"The question of defendant's negligent failure to furnish a safe place to work in our opinion presented a single issue of fact, independent of any of the other three issues embraced in the pleadings. It is true that the duty to warn is sometimes treated under the general duty of the master to furnish his servants a safe place to work; but, when so treated, it does not arise, except in those cases where from its very nature the making of the place safe is rendered impossible, or, as a secondary duty, where the master has failed in the primary duty to furnish a safe place to work."

Thus the breach of duty to warn of danger is likewise regarded as a breach of duty to provide a reasonably safe place to work.

■■■ The evidence fully sustained the jury's finding that appellant was negligent in that it failed to inform Johnson of the fact that electricity was coming to and into the top southeast corner of the structure before ordering him to go thereon and remove the broken jumper.

On this issue several experienced electricians testified. Each of them testified that it was the duty of the supervisor or foreman in charge of work on a substation structure to warn all employees what part was hot and what part was cold; that where a part was hot and a part was cold he should, in the case of the individual worker stand by and point out the hot and cold parts and personally direct the work. In answer to hypothetical questions, based upon all of the facts and circumstances under which Johnson lost his life, Persons testified:

"The supervisor employee in charge of this work had the full responsibility on his shoulders of the safety and protection of his employees ahead of anything else he is doing in connection with the job. That is universal in safety work, that the safety of the employee comes ahead of service to the consumer."

"Standard practice is not only to tell them it is hot, but to tag it with a danger sign which is easily seen, the corner of the structures of some conductors, or some pieces of apparatus that is approached, or that is hot—that is approaching the hot wires, or that is hot, and my opinion is that if this corner of the structure could have just had a danger sign warning on it anywhere on there it would have called this inexperienced man's attention that this was a hot corner of the structure."

No warning sign was on the structure, nor was any warning given to Johnson. Higgins, the supervisor who directed Johnson to do the work, testified that he went under the structure and was looking up at the switches in question when he heard a groan and looking around saw Johnson falling from the top southeast corner of the structure. Three other employees of appellant who saw Johnson falling from the structure testified that Higgins was not under the structure at the time, but that he was at the south end of the structure. Thus Higgins did not perform his duty to warn Johnson and to point out to him the part of the structure that was hot, and did not stand by and personally direct the work which Johnson was ordered to do. Johnson knew nothing of the conditions under which the substation was being operated, and lost his life in a few moments after he started to work. The foregoing facts and circumstances make a strong case of negligence for failure to warn Johnson that the southeast top corner of the substation structure was energized with electricity at the time he was ordered to climb the structure and replace the broken jumper thereon. The manner and conditions under which the accident or startling event occurred were known to Higgins who ordered Johnson to climb the structure and do the work on the broken jumper, and the startling event or accident voiced itself through the excited and emotional statements of Higgins that "It's all my fault. * * * I sent him up into that hot stuff."

A case most directly in point is City of Weatherford Water, Light & Ice Company v. Veit, Tex.Civ.App., 196 S.W. 986, 991, wherein Veit, an experienced lineman, was called upon to do certain lineman's work. The lines on the pole he was required to climb to do the work were not constructed in the usual and customary manner of high voltage or tension lines, in that the high tension line was placed on the inner portion of the cross bar. Veit came in contact with this high tension line and was hurt. The court held that the company was guilty of active negligence in sending its employee up into the dangerous position of the high tension wires without having warned or notified him of the unusual manner in which the high tension wires were carried on the cross bar. The court say:

"It was the duty of the Telephone Company undoubtedly to furnish its said employe with a safe place to work, and it was active negligence on its part to send such employe into the dangerous position up among its wires without specific warning of the location and uninsulated condition of the high voltage with which Veit came in contact * * *."

And the court further say:

"* * * there yet remains the undisputed proof that the Telephone Company, through its directing agent, called from his home in a distant city one of its employes, Veit, who was unacquainted with

conditions relating to the work he was called upon to do, and, having so called him, sent him up into and among conditions known to be dangerous, and which resulted in his injuries, without warning him of the conditions or danger. If this does not manifest active negligence on the part of the Telephone Company, we are wholly at fault in our judgment."

The rule is settled by numerous authorities that if the employment is of a dangerous character, requiring skill and caution for its proper discharge with safety to the employee, and the employer is aware of the danger, and has reason to know that the employee is ignorant or unaware of the danger, the employer is required to warn or caution the employee of the danger, and that the failure of the employer to do so is negligence. See Texarkana & Ft. S. Ry. Co. v. Brandon, 59 Tex.Civ.App. 451, 126 S.W. 703; Texarkana Table and Furniture Co. v. Webb, Tex.Civ.App., 86 S.W. 782 (error refused); and General Electric Co. v. Murray, 32 Tex.Civ.App. 226, 74 S.W. 50; Beaumont, St. L. & W. Ry. Co. v. Schmidt, 123 Tex. 580, 72 S.W.2d 899; 3 Labatt's Master and Servant, p. 3066, § 1146.

In this connection it may be here observed that the jury found that Johnson did not know and could not in the exercise of ordinary care have known that the wires coming to and into the southeast top corner of the substation structure were energized with electricity at the time of the accident.

Appellant's Points 26 through 29 raise the same questions as were raised by its foregoing Points 12 to 16. These questions as to want of sufficient evidence to support the jury's findings of negligence need not be further discussed. None of these points presents error.

By Points 17 and 18 appellant contends that the evidence is insufficient to support the jury's findings that each of the foregoing negligence acts of appellant was a proximate cause of Johnson's death. In arguing to these points appellant asserts that having instructed Johnson to replace the broken jumper at the top of the southwest corner of the structure, it could not reasonably foresee that injury would result from leaving the southeast top corner of the structure energized, because that corner was more than twelve feet from the point Johnson was ordered to work; and that it could not foresee that he would attempt to climb the structure at the southeast corner to do the work assigned to him on top the southwest corner; and that the failure to de-energize and make dead the upper portion of the southeast bay or corner of the structure merely created a condition which was only a remote rather than a proximate cause of Johnson's death. These contentions are without merit.

The foregoing evidence with respect to the manner in which the accident occurred will not be repeated here. Suffice it to say that Johnson was not told how he should climb upon the structure to do the work assigned to him. No ladder was available. The photographs of the structure and the undisputed evidence show that the substation structure could easily be climbed at the southeast corner where the greatest distance between any two steps from the ground up was only two feet. The first step on the structure at the southwest corner was five feet and eight inches above the ground. This difficulty of reaching the first step was visible to a person trying to climb the structure at the southwest corner. Robinson, appellant's foreman in charge, testified to the comparative difficulty of climbing the structure at the southwest corner. This difficulty was visible to any one and was necessarily seen by and known to Higgins, who ordered Johnson to go upon the structure. The jury were clearly justified in finding that appellant should have reasonably foreseen that an employee who was ordered to go upon the structure to work might climb upon the structure at the less difficult southeast corner rather than at the southwest corner, and that in doing so he could be electrocuted by the high voltage electric lines coming into the southeast corner. The substation had never before been operated as it was at the time, and Johnson had not worked on it in that condition. In normal operations the electricity which came into the structure passed

through the transformer banks in the north bay of the structure. These were dead or de-energized and men were working on them at the time Johnson attempted to climb the structure. From these facts the appellant might have reasonably anticipated that an employee seeing these men and others working over the substation, could reasonably conclude that the entire station was dead or de-energized. De-energizing required from ten to thirty minutes, and the substation was serving no customers at the time. And since the work of repairing and changing the structure was going on over the entire structure, except the southeast bay, and since all experts testified that under such facts and circumstances the entire structure should under good and standard safety practice be de-energized, appellant should have reasonably foreseen that some employee, knowing of such good and standard safety practice, might go upon the portion of the structure which was negligently left energized. The testimony of the experts also showed that good and standard safety practice required that Johnson, who was ignorant of the fact that the southeast corner was energized, be warned by sign or personally by Higgins of the electricity coming into the southeast corner of the structure, and having disobeyed these known safety practices, appellant should have anticipated or foreseen that some employee relying upon such safety practices might come in contact with the wires which should have been de-energized. The foregoing facts and circumstances fully support the jury's findings on the issues of proximate cause of the death of Johnson.

■ By Points 19 to 25 appellant contends that there was no pleading showing any act of negligence on the part of appellant, and particularly the acts of negligence found by the jury. These contentions are without merit. The petition alleged that appellant negligently failed to provide a safe place for Johnson, particularly by paragraphs "(e)" and "(f)," because it failed to have the substation structure de-energized or dead when it ordered Johnson to go thereon to remove the broken jumper, and because it failed to warn or inform Johnson that the southeast corner of the structure was energized when Johnson was ordered thereon to work. Under our foregoing holdings the evidence fully sustained the jury's findings that these acts constituted negligence on the part of appellant. The points are without merit.

■■ By Points 11 and 31 appellant contends that the court erred in not instructing a verdict in its behalf, because the evidence showed that Johnson had two or more ways of going to the southwest top corner of the substation structure to perform the task assigned to him; and that by attempting to reach the place he was assigned to work by going up the energized southeast corner, he chose the dangerous way and therefore assumed the risk incident thereto.

The doctrine of assumed risk is not involved in the case, because Johnson did not assume the negligence of appellant in failing to de-energize the southeast corner of the structure and in failing to warn him that the southeast corner was energized before ordering him to go upon the structure to work. And this is particularly so since the jury found, in answer to special issues submitted, that Johnson did not know and could not have known, in the exercise of ordinary care, that the wires coming to and into the southeast corner of the substation structure were energized at the time he attempted to go up the southeast corner of the structure. In view of these findings of the jury the cases of St. Louis & S. F. Ry. Co. v. Mathis, 101 Tex. 342, 107 S.W. 530; St. Louis Southwestern R. Co. v. Hynson, 101 Tex. 543, 109 S.W. 929; and Southern Pac. Co. v. De la Cruz, Tex.Com.App., 228 S.W. 108, are not in point. In each of these cases it was found that the servant or employee knew of the danger, or in the exercise of ordinary care should have known thereof. With the rule stated in these decisions as to assumed risk there is no disagreement, but they are not applicable here. The rule applicable here is stated in the case of Chicago R. I. & G. R. Co. v. DeBord, 109 Texas 20, 192 S.W. 767, 768, where in the court say:

"The rule is too well settled to require the citation of authorities that under the

common-law doctrine of assumed risk the plaintiff in a negligent suit does not assume any risks or dangers arising from the negligence of the defendant of which he has no knowledge; * * *."

The rule applicable here is also well stated in Prosser on Torts, p. 385, as follows:

"Knowledge of the risk is the watchword of assumption of risk. Ordinarily the plaintiff will not be taken to assume any risks or conditions or actions of which he is ignorant. Furthermore, he must not only know of the facts which create the danger, but he must comprehend and appreciate the danger itself. A defect and the danger arising from it are not necessarily to be identified, and a person may know of one without appreciating the other. If, because of age, or lack of information or experience he does not comprehend the risk involved in a known situation, he will not be taken to assent to assuming."

■■■ Johnson was not as a matter of law shown to have known of the danger incident to climbing the substation structure at its southeast corner. He did not know that appellant and its employees had negligently left it energized. He was not warned in any manner of this danger. No way to his work was shown him. He had worked only once before for a few minutes on the substation, and never even reached the point where he was to work at the time he sustained his death by coming in contact with the high voltage wires. The superintendent in charge of the substation testified that he did not warn Johnson in any manner that the southeast corner was energized, and did not in any manner direct him as to how he should climb the substation structure to reach the point where he was to replace the broken jumper. The experts testified that standard safety practice required appellant under the facts stated to de-energize the substation entirely or to properly warn workers thereon of any part that was left energized. The authorities are uniform in holding that the law of assumed risk has no application where the danger is created by the negligence of the master in failing to perform his nondelegable duty to furnish the servant a safe place to work, especially dangers which were unknown to the servant, or could not have been discovered by him by the exercise of ordinary care. No lengthy discussion of the question need be made. International G. N. Ry. Co. v. Lowry, Tex.Civ. App., 98 S.W.2d 383; Houston Lighting & Power Co. of 1905 v. Conley, Tex.Civ. App., 171 S.W. 561, error refused; Texas & New Orleans Ry. Co. v. Gericke, Tex. Com.App., 231 S.W. 745.

■■■ By points 32 to 34, 41 to 44, and 46 to 49 appellant contends in one way or another that the evidence showed as a matter of law that Johnson was guilty of contributory negligence in attempting to climb up the energized southeast corner of the substation structure to do the work he was ordered to do at the top southwest corner of the structure. Part of the issues of contributory negligence are controlled by the facts stated under the foregoing question relating to assumed risk. Suffice it to say here that the jury found that Johnson did not know and could not have known, in the exercise of ordinary care, that the wires coming to and into the southeast corner of the structure were energized when he attempted to climb upon the structure to do the work he was assigned to do. Our foregoing findings of fact fully sustain the jury's findings.

■■■ With respect to the issue of whether Johnson failed to keep a proper lookout for his own safety, the jury found that he did. This finding is fully supported by the foregoing facts. Under the standard safety practice rules controlling the handling of men doing work on the substation not in use at the time, a worker ordered to do work thereon might reasonably assume that the whole structure had been de-energized. Such worker might also reasonably assume under the safety practice rules that if any part of the structure were energized, the foreman or supervisor in charge was under duty to warn him of that, and that he would do so. The undisputed facts show that Johnson was not warned by sign or otherwise that the southeast corner was energized. Electricity is a dangerous and invisible instrumentality. The appellant city must so treat it with

respect to the safety of its employees whom it requires to handle or go near it. The primary duty is upon the appellant city to require that its foremen or supervisors conform to all standard safety practices in the performance of the appellant city's non-delegable duty of furnishing its employees with a safe place to work. Except the fact that Johnson was electrocuted at the southeast corner of the structure there was no testimony that he failed to keep a proper lookout for his own safety.

In absence of proof, except the fact that he did go up at the southeast corner, it cannot be assumed that he knew that the corner was energized, because he was an experienced lineman and knew that if he went up into these energized wires, he would be electrocuted, and the law does not assume that he would thus virtually commit suicide.

The foregoing evidence also supports the jury's finding that Johnson was not negligent in climbing the structure in the manner and at the place he did, without first ascertaining whether or not the wires were energized at the southeast top corner of the structure. Under the standard safety practices applicable to the facts and circumstances, it was the primary duty of the appellant to de-energize the structure or to warn Johnson what part was hot and what part was cold. Johnson had the right to assume that appellant would obey these standard safety rules. Especially should appellant and its supervisor in charge observe these rules, because the undisputed facts show that Johnson's regular employment was not at the substation, but outside as a lineman. He was not shown to have known of the manner in which the station was being operated.

The jury also found that there was no ladder available for use by Johnson to reach the top southwest corner of the structure where he was ordered to replace the broken jumper. The only evidence on this issue was that there was only one ladder available at the substation, which was being used at the time by other employees, and was lashed down at another place in the substation.

The fact that Johnson may have earlier in the night been called as a lineman to close the switches at 7th and Chicon Streets, which energized the 11 Kv. into the top southeast bay of the substation with 4 Kv. does not show as a matter of fact that he knew such corner was energized when several hours later he was directed to go upon the structure and replace the broken jumper. In the first place the electricity coming into the substation usually came through transformers at another part of the substation structure, which at the time Johnson was ordered to do the work was dead and was being worked on by other employees. From these facts the jury could have reasonably found that Johnson believed the whole structure to be dead.

In the second place several changes were made after Johnson closed the switches at 7th and Chicon Streets before he was sent to do the work assigned him on the structure of the substation. The foregoing facts at most merely raised jury issues as to the several acts of contributory negligence, and their findings thereon are supported by sufficient evidence.

By Point 45 appellant contends that if there were negligence shown by leaving the southeast corner of the structure energized, such negligence was that of Johnson or one of his fellow servants, and for which appellant is not liable.

Under our foregoing holdings this suit is for damages resulting from the negligence of appellant in failing to provide the deceased with a safe place to work, which is a non-delegable duty to which the fellow servant doctrine does not apply. Fort Worth Elevator Co. v. Russell, 123 Texas 128, 70 S.W.2d 397; Waxahachie Cotton Seed Oil Co. v. McClain, 27 Tex. Civ.App. 334, 66 S.W. 226; 29 Tex.Jur., 152, § 84.

Appellant's 58 points present its four main questions hereinabove discussed, namely:

1. That the evidence was insufficient to show that Johnson met his death by coming in contact with energized wires at the southeast corner of its substation.

2. That the evidence was insufficient to show any act of negligence on the part of appellant.

3. That the evidence showed as a matter of law that Johnson by attempting to climb up the southeast corner of the sub-station structure assumed the risk incident thereto, or that he was guilty of contributory negligence in so attempting to climb the structure.

4. That if negligence were shown in failure to de-energize the structure causing the death of Johnson, it was his own negligence or that of a fellow servant, for which appellant was not liable.

Our foregoing opinion disposes of these main questions. The remaining points of appellant present questions of practice, which we have carefully considered and overrule without discussion.

The judgment of the trial court is affirmed.

Affirmed.